**IN THE UNITED STATES DISTRICT COURT FOR**

**THE MIDDLE DISTRICT OF FLORIDA, ORLANDO DIVISION**

| | |
|---|---|
| PARKER AUTO BODY, INC., *et al.*, | * |
| | * |
| PLAINTIFFS, | * |
| | * MDL Docket No. 2557 |
| v. | * |
| | * Case No. 14-cv-6004-GAP-TBS |
| STATE FARM MUTUAL AUTOMOBILE | * |
| INSURANCE COMPANY, *et al.*, | * ORIGINALLY FILED IN THE |
| | * WESTERN DISTRICT OF |
| DEFENDANTS. | * LOUISIANA |
| | * |

**MOVING DEFENDANTS'**
**MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

Pursuant to Federal Rules of Civil Procedure 8 and 12(b)(6), the Defendants

listed in Exhibit A ("Moving Defendants") hereby move to dismiss the First Amended

Complaint ("FAC") (Doc. 119) with prejudice for, once again, failing to state a claim

upon which relief may be granted.

**MEMORANDUM OF LAW**

In this case, there are forty (40) named Plaintiffs.  Out of those forty body

shops, the FAC provides specific information regarding the prices paid to only three:

1) Krystal Auto, 2) Brouillette's, and 3) Advantage Collision ("Advantage").  FAC ¶¶

257-265.  Even as to those three body shops (out of forty), the FAC provides price

information for only a single year – different for each shop:  2011 for Krystal Auto (Id.

¶ 257); 2012 for Brouillette's (Id. ¶ 260); and 2013 for Advantage (Id. ¶ 262).  From

this sparse and unconnected price information, Plaintiffs would ask the Court to

1

imagine parallel pricing activity from which the Court could then infer a price-fixing agreement across the State of Louisiana for twenty years.

Further, the FAC identifies three different subsets of Defendants for each one of these three shops and years:

- Krystal Auto in 2011 identifies prices paid by: State Farm, Progressive, Louisiana Farm Bureau, Liberty Mutual, Allstate, USAA, Safeco, ANPAC, Allstate, eSurance, Imperial Fire, and GEICO (id. ¶¶ 258-259);

- Brouillette's in 2012 identifies prices paid by: State Farm, Progressive, Louisiana Farm Bureau, Liberty Mutual, Allstate, USAA, Safeco, ANPAC, GEICO, and Zurich (id. ¶ 261);

- Advantage in 2013 identifies prices paid by: State Farm, Allstate, Louisiana Farm Bureau, Safeco, Progressive, USAgencies, 21st Century, Safeway, Liberty Mutual, GEICO, and Nationwide (id. ¶¶ 263-264).

Not only are these subsets of Defendants different for each year and each shop, but many Defendants are not involved in any of this alleged pricing activity.  With 563 Paragraphs in the entire Complaint, there is no mention whatsoever of the prices paid by any of the following Defendants: Go-Auto, Government Employees, Shelter, Direct General, AIG, Sentry, Hanover, Hartford, Encompass, Travelers, Farmers, United Fire, America First, Fireman's Fund.

The pleading deficiencies of the FAC have already been detailed in the initial Motions to Dismiss (Docs. 9, 17, 19), and the Court's Orders in this case (Docs. 109, 118), as well as the Court's Orders in A&E Auto Body, Inc. v. 21st Century Centennial Ins. Co. (No. 6:14-cv-00310, Docs. 110, 291)) ("A&E") which provided ample guidance as to the inadequacy of the nearly identical Complaints filed in this

MDL.  To the extent to which Plaintiffs now try to provide some allegations of fact that go beyond conclusory allegations and group pleadings, those few added facts only serve to highlight Plaintiffs' inability to allege a plausible cause of action. Unable to hide behind group pleadings, the FAC is a threadbare collection of isolated facts, relating to diverse subsets of Defendants.  The FAC comes nowhere close to alleging any agreement to fix prices or boycott by fifty-seven Defendants. Similarly, the remaining state law claims of tortious interference and unjust enrichment continue to ignore the Court's many admonitions regarding shotgun pleadings and the need to allege specific facts.  Therefore, the FAC should be dismissed with prejudice.

I.      PLAINTIFFS' SHERMAN ACT CLAIMS (COUNT I AND COUNT II)
        SHOULD BE DISMISSED WITH PREJUDICE.

The FAC reveals a stunning lack of facts that could plausibly suggest an agreement among the fifty-seven Defendants that Plaintiffs have chosen to sue.  To state a claim under Section 1 of the Sherman Act, a plaintiff must allege: (1) an agreement between two or more parties (2) that unreasonably restrains trade. Levine v. Cent. Fla. Med. Affiliates, Inc., 72 F.3d 1538, 1545 (11th Cir. 1996). See also Duty Free Americas, Inc. v. Estee Lauder Companies, Inc., 946 F. Supp. 2d 1321, 1328-29 (S.D. Fl. May 9, 2013) ("Both § 1 and § 2 conspiracy claims 'require the same threshold showing – the existence of an agreement to restrain trade.'") (quoting Todorov v. DCH Healthcare Authority, 921 F.2d 1438, 1460, n. 35 (11th Cir.1991)).  This Court has already recognized that the "crucial question" on a Section 1 claim is whether the challenged conduct "stems from independent decision

3

or from an agreement, tacit or express." A&E Auto Body, Inc. v. 21st Century

Centennial Ins. Co., No. 6:14-cv-00310, 2015 WL 304048, at *9 (M.D. Fla. Jan. 21,

2015) (quoting Bell Atl. v. Twombly, 550 U.S. 544, 553 (2007)).  The FAC adds bulk

but fails to provide any facts that would plausibly suggest an agreement among fifty-

seven competing insurance companies to fix prices or to boycott the forty plaintiff

shops.[1]

   A.   Plaintiffs Fail to Allege Parallel Action Among Defendants That Would
        Support a Plausible Inference of an Agreement to Fix Prices.

Recognizing that they have no facts alleging an agreement, Plaintiffs ask the

Court to infer an agreement by inferring parallel action.  The FAC does not allege

parallel action.  Instead, it alleges that diverse subsets of Defendants, at different

points in time, paid the same price to one of only three body shops out of the forty

named Plaintiffs.  While even an adequate "showing of parallel business behavior"

can fail to suggest an agreement where there are other plausible explanations (A&E,

2015 WL 304048, at *9), here, the FAC fails to allege facts showing parallel

behavior, much less any supposed agreement that could be inferred from such

parallel action.  Therefore, Plaintiffs' price-fixing claim must be dismissed.

   1.   Alleging a Failure By Some Defendants to Pay the "Posted"
        Rate of Three Body Shops Does Not Support a Plausible
        Inference of an Agreement to Fix Prices Among All Defendants.

Plaintiffs purport to allege an agreement to fix prices across the entire State of

Louisiana (FAC ¶¶ 105, 106, 113-16), but they supply so few allegations as to make

---

[1] The various allegations about the body shop repair process (FAC ¶¶ 121-162) do
nothing to support a cause of action.

it impossible – not merely implausible – to infer any agreement to fix prices. According to the FAC, the relevant product market is auto body repair services: "As traders within an identifiable market product, auto collision repair, the effect of competition between collision repair shops in the only effect to be measured." FAC ¶ 487.  In a group pleading, the FAC alleges that Defendants set a uniform price ($42/hr) for the entire State of Louisiana:  "The Defendants generally leave a particularly fixed price structure in place for several years in a row.  The determined 'market' or 'prevailing' rate for the State of Louisiana was $42.00 per hour body labor for at least two years."  Id. ¶ 489.  But the FAC complains that subsets of Defendants paid higher rates – either $48/hr or $50/hr – to three of the named Plaintiffs during 2011, 2012, or 2013, which is entirely inconsistent with alleged conspiratorial behavior to depress reimbursement rates.  Id. ¶¶ 257-65.

Plaintiffs also assert that a plausible inference of price-fixing is presented whenever some subset of the Defendants pays less than Plaintiffs' "posted" rate. The FAC never explains why the "posted rate" is relevant or meaningful. In fact, it is not. A body shop's posted rate is as meaningless as the "sticker price" in a car dealer's showroom. While that might be the price at which the seller would like to sell, it is not the actual, negotiated sale price at which sales are made in the market. And that is the only price that has relevance and meaning.

Moreover, the FAC provides no basis to infer that the Defendants were agreeing to fix prices across Louisiana simply because some Defendants paid one of three named Plaintiffs, in different years, something slightly less than their

"posted" price.  Even as to these three shops, the paucity and randomness of
Plaintiffs' isolated price allegations cannot support any inference of an agreement to
fix prices.  For example, Advantage alleges that it is one of ten shops in Houma,
Louisiana.  Id. ¶ 262.  Yet, Advantage does not allege what price the other nine
shops in Houma charged.  It does not even identify the "posted" prices of the other
shops.  Nor does it allege the prices that Advantage actually charged (and received)
for work only its "posted" price in 2013.  Obviously, there is no suggestion of
collusion in setting the "market rate" if the other nine shops (and perhaps Advantage
too) all charged less than Advantage's "posted" price.

Likewise, in Paragraph 260, the FAC alleges that Brouillette's conducts
business in central Gonzales, Louisiana, and posted a labor rate of $50/hr in 2012.
There is no mention in the FAC of the labor rate of any other body shop in or near
Gonzales, including former Plaintiff Guillory's Collision Center, which also conducts
its business in Gonzales, Louisiana.  Id. ¶¶ 5, 23.  Price-fixing cannot be inferred
merely by alleging that some Defendants paid less than Brouillette's asking price in
one year.

When Plaintiffs exclaim that it is implausible to assume that the rate for body
work is the same throughout the entire state of Louisiana (id. ¶¶ 268-69), the
Plaintiffs expose two additional problems with their FAC.  First, the FAC provides
absolutely no facts as to the rates charged or paid by any Defendant throughout
Louisiana.  Plaintiffs offer unsupported speculation when they allege that "Despite
there being demonstrable differences" prices should vary based on population.  Id. ¶

6

268.  But rather than alleging that their own operations are confined to insular geographic markets, Plaintiffs allege that they "perform repairs on vehicles primarily garaged at locations throughout the State of Louisiana."  Id. ¶ 105.

        2.      Unspecified and Random Time Frames Further Preclude Any Finding of Parallel Pricing.

Plaintiffs allege that the supposed price-fixing conspiracy has been in place for twenty years: "Over the last twenty years, in addition to manufacturing a 'market rate,' the Defendants have utilized other methods of intimidating the Plaintiffs and other body shops to suppress labor rates."  Id. ¶ 271.  But far from showing consistent pricing throughout the twenty-year period, Plaintiffs offer only a handful of isolated instances involving different Defendants, in different years, regarding only three shops.  Id. ¶¶ 257-65.  Rather than offering parallel facts about the prices that each Defendant was paying each year, Plaintiffs offer only a disjointed patchwork of their posted prices.

The allegations of different posted rates, at different times, with subsets of non-identical Defendants paying rates at some times, and other subsets of Defendants paying prices at other times, underscores the failure to allege any consistent or identifiable parallel behavior.  Far from coming forward with facts showing parallel behavior, Plaintiffs offer only a few random pieces of a marketplace jigsaw puzzle – and those pieces don't fit.

3.    Rather Than Showing Parallel Action, The FAC Shows the
Absence of Any Pattern of Price Movements.

The FAC shows no pattern of parallel action by alleging that different subsets

of Defendants paid the same price, to three different shops, in different years.

Likewise, by alleging that only some Defendants raised their prices in response to a

State Farm price rise, the FAC suggests that all others did not follow suit.

Far from showing any type of parallel price movement by all Defendants

throughout an alleged conspiracy period, the FAC identifies only one instance of any

price change.  The FAC alleges that only Progressive, Allstate, Louisiana Farm

Bureau, Safeway, Liberty Mutual, Nationwide, 21st Century, and Imperial followed

State Farm's price increase in summer 2013.  FAC ¶ 269.  The FAC does not allege

that any of these Defendants made a parallel price move: GEICO, USAgencies,

Safeco, USAA, GoAuto, Government Employees, Shelter, Direct General, AIG,

Sentry, Hanover, Hartford, Encompass, Travelers, Farmers, United Fire, America

First, American National, eSurance and Fireman's Fund.  Even more striking,

however, is the fact that out of a twenty-year conspiracy period, in a 563 Paragraph

Complaint, Plaintiffs provide only one instance of any Defendants matching a price

hike by their competitor.  Conspiracies and parallel actions are not shown by one

incident (or coincident) in over twenty years.[2]

_____

[2] These specific, and limited allegations as to some Defendants destroys the
sweeping generalizations appearing elsewhere, and illustrates the group pleading
problem that was originally identified by this Court almost one year ago in his June
11, 2014 Order in A&E (Doc. 110).  See FAC ¶ 518  "Defendants all raise their

4. The Hodge Podge of Repair Practices Refutes Any Contention of Parallel Action.

In a further attempt to conceal the lack of facts showing parallel pricing behavior, Plaintiffs serve up a disjointed smorgasbord of non-price practices. But the facts alleged show differences more than any parallel action or agreement between all Defendants.

As to the industry-wide use of one of three estimating databases (FAC ¶ 278), this Court has already held that the allegations regarding the use of estimating databases were insufficient to state a Section 1 Claim:

> As with the refusal to pay more than State Farm's allegedly depressed market rate, there is nothing about the refusal to pay in accord with repair-estimating databases, standing alone, that suggests that the Defendants are acting out of anything other than their own economic self-interest. And the Plaintiffs have not placed this refusal to adhere to the databases in a context that suggests a preceding agreement. See Twombly, 550 U.S. at 557, 127 S.Ct. at 1966. They do not, for example, allege that the Defendants formerly accepted the databases as authoritative but, around the same time, stopped doing so. In fact, the Plaintiffs do not allege that any of the Defendants ever strictly abided by the databases.
>
> It is not even clear that the Defendants' actions in regard to the databases could even be described as parallel behavior. The Defendants are not alleged to have acted uniformly, such as by only agreeing to pay the same fraction of the estimate provided by a database. Accepting the Plaintiffs' allegations as true, the Defendants are simply refusing to be bound by third-party estimates that they are not legally obligated to follow.

---

'market rates' … within days of State Farm. . . ." Id. ¶ 524 "All Defendants change their rates immediately following a rate change…."

<u>A&E</u>, 2015 WL 304048, at *11.  The substance of the allegations here is the same as in <u>A&E</u>.  <u>Compare</u> FAC ¶¶ 276-303 with <u>A&E</u> FAC ¶¶ 105-117.  The deficiencies identified in <u>A&E</u> are the same as in the FAC:  (1) there is no allegation that the defendants, all at the same time, stopped accepting the databases as authoritative; (2) there is no allegation that the Defendants ever strictly adhered to the databases; and (3) there is no allegation that the Defendants ever agreed to pay the same fraction of an estimate provided by a database.  Thus, the same result should be found here.

The specific allegations regarding various repair procedures are leveled against only a few Defendants.  This diversity underscores the fact that not all Defendants are taking uniform action:

- The FAC alleges that Direct General, State Farm, and Allstate, alone, demand photos at stages of repair.  FAC ¶¶ 158-160.  There is no allegation that any other insurer does the same.

- The FAC alleges that some insurers – State Farm, Louisiana Farm Bureau, and Liberty Mutual – have told Plaintiffs that they are "the only shop" seeking a price increase.  <u>Id.</u> ¶ 272.  There are no similar allegations against the other Defendants (although the FAC conjectures that statements were made by "representatives of the remaining Defendants whose names are not presently known.").  <u>Id.</u>

- The FAC alleges that State Farm, Progressive, Allstate and USAA, have historically refused to pay for feather, prime and block (<u>id.</u> ¶ 304), but says nothing about whether the other Defendants pay for such a procedure.

- The FAC alleges that some insurers – State Farm, Progressive, USAA, Allstate, Liberty Mutual, Safeco, Direct General, GEICO, Nationwide, Allstate– refuse to pay for denib and finesse (<u>id.</u> ¶ 307), but does not identify any other Defendants.

- The FAC alleges that some insurers – State Farm, GEICO, Liberty Mutual, Allstate and Progressive – specify aftermarket parts to be used in repairs and do not provide adequate guarantees (see id. ¶¶ 325-342), but does not identify any other Defendants.

It is fundamental that the variation alleged by Plaintiffs undermines their assertion of a cohesive and uniform group taking parallel action. See, e.g., In re Baby Food Antitrust Litig., 166 F.3d 112, 132 (3d Cir. 1999) (affirming summary judgment where the facts "refute rather than support" plaintiffs' allegations of parallel conduct). See also In re Beef Indus. Antitrust Litig., 907 F.2d 510, 514 (5th Cir. 1990) ("When an antitrust plaintiff relies on circumstantial evidence of conscious parallelism to prove a § 1 claim, he must first demonstrate that the defendants' actions were parallel. The cattlemen have not done this.") (citations omitted); Aviation Specialties, Inc. v. United Technologies Corp., 568 F.2d 1186, 1192 (5th Cir. 1978) (plaintiff "brought forth no evidence of parallel behavior suggesting an unlawful agreement.").

     5.     There Exist Many Explanations More Plausible Than "Collusion" to Explain Any Isolated Occurrences of Similar Prices By Diverse Subsets of Defendants.

Even if it were assumed, arguendo, that the FAC did allege parallel pricing – which it has failed to do – that would not plausibly imply any agreement:

> It is not illegal for a party to decide it is unwilling to pay a higher hourly rate than its competitors have to pay, and the fact that a number of the Defendants made statements to that effect does not tip the scales toward illegality.  The Sherman Act does not restrict the "long recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal; and, of course, he may announce in advance the circumstances under which he will refuse to sell.

A&E, 2015 WL 304048, at *10. See also Quality Auto Body, Inc. v. Allstate Ins. Co., 660 F.2d 1195, 1204 (7th Cir. 1981) ("[T]he insurer's refusal to pay more than the prevailing competitive rate is not illegal.").

The Plaintiffs leap to the unwarranted conclusion that anytime two or more Defendants are paying the same rate, it must be because of an agreement among all Defendants to fix prices.  FAC ¶¶ 269, 270.  To the contrary, courts and economists would expect to see prices being matched in a competitive market.  In re Graphics Processing Antitrust Litig., 527 F. Supp. 2d 1011, 1022 (N.D. Cal. 2007) ("We must remember that competitive market forces will tend to drive the prices of like goods to the same level, so like prices on like products are not, standing alone, sufficient to implicate price-fixing.").  See also Quality Auto Body, 660 F.2d at 1205 ("the practice of the insurance companies to calculate the reimbursement for its insured based upon the lowest prevailing price in the market place (and to insure the integrity of that estimate by having an open list of competing shops which will generally accept it) is the very essence of competition.") (quoting Chick's Auto Body v. State Farm Mutual Auto. Ins. Co., 168 N.J. Super. 68, 87 (1979)).

The FAC offers this blind speculation:  "The odds of all the Defendants independently reaching the same conclusion as State Farm without conducting even a pro forma survey would be outside the realm of possibility."  FAC ¶ 269. See also, id. ¶ 316.  Of course, Plaintiffs have failed to identify even a single incident in twenty years where "all the Defendants" paid the same price.  The more plausible explanation for the isolated instances alleged is that the body shops would tell every

12

other insurer that State Farm is now paying a higher price and demand that each insurer increase its price as well   Another plausible way for insurers to learn the rates being paid to shops would be through their common network of DRP shops. As plaintiffs allege, "the vast majority of them share DRP shops." Id. ¶ 416.  These are more plausible than Plaintiffs' unsupported speculation of collusion.

     B.     Plaintiffs Fail to Allege an Agreement to Boycott.

The Group Boycott claim (Count II) also fails because there is no factual basis for inferring any agreement.  As with price-fixing, a fundamental element of a group boycott claim is an agreement.  See A&E, 2015 WL 304048, at *12 ("In addition, to state a claim for a violation of § 1 by way of a boycott also requires allegations plausibly suggesting an agreement by the Defendants.").  The FAC shows disparate – not parallel – action by the various Defendants.

Furthermore, Plaintiffs fail to allege any "concerted refusal to deal" – a requirement for any boycott claim under the Sherman Act. In A&E, this Court identified the deficiency with regard to the "steering" allegations in that Complaint: "[T]here is no allegation that any Defendant refused to allow any of its insureds to obtain a repair from such a shop, or refused to pay for repairs performed at such a shop." A&E, 2015 WL 304048, at *10.  As to most defendants, there are no allegations of steering whatsoever.[3]  See FAC ¶¶ 343-420.  As to the others, the few

_____

[3] No defendants from the following corporate families are mentioned in the "Steering" section of the FAC: Safeco, Liberty Mutual, Government Employees, Shelter, Direct General, AIG, Nationwide, Sentry, Hanover, Encompass, Travelers,

meager allegations advanced by plaintiffs fail to identify any refusal by any

Defendant to allow insureds to obtain a repair, or to pay for such repairs.  In fact,

they tend to show the opposite.  See, e.g., id. ¶¶ 366, 373.  Indeed, far from alleging

that all Defendants refused to deal with any of the Plaintiffs, the FAC alleges that

Defendants did deal with the Plaintiffs – the Plaintiffs just wanted bigger payments.

In another failed attempt to conjure up an agreement to boycott, the FAC

alleges that Advantage lost business in 2013 from three insurer Defendants –

GEICO, Allstate and USAgencies.  Id. ¶¶ 409-10.  The FAC says nothing about any

lost business from all other insurers.  And Advantage would know whether it also lost

business from any of the others.  There is no allegation as to the volume of business

from any of these Defendants.  The most logical implication from this omission is

that the conduct of all other Defendants would contravene Plaintiffs' theory of

collusion.

Ignoring the absence of any allegation of Advantage losing business from the

majority of Defendants, Plaintiffs offer this implausible speculation: "The only

reasonable conclusion . . . is the named Defendants shared information about and

specifically targeted as a group the particular shops who refused to comply . . . ."  Id.

¶ 417.  But the reduction in work from only three insurers out of a much larger group

does not suggest a group decision to withhold business.  Further, there are no

similar allegations as to Plaintiffs other than Advantage.  Moreover, Plaintiffs fail to

---

Hartford, Farmers, United Fire, 21st Century, America First, eSurance, Fireman's
Fund and Imperial.  See FAC ¶¶ 343-420.

account for many other more plausible reasons for a reduction in business for this one Plaintiff.  For example, those three insurers could have been making a decision to exit the Louisiana market (or that portion of the State); they could have lost business to other insurers (possibly to some of the other Defendants for whom Advantage provides no suggestion of lost business); they could have found better shops; they could have been dissatisfied with Advantage's work; and perhaps, the work declined due to safer drivers or less expensive repairs.  As with the price-fixing allegations, a few, isolated facts regarding one body shop do not suggest an agreement or parallel behavior.  To the contrary, by specifying a loss in business for only one year, for only one Plaintiff, from only three Defendants, the FAC reveals the complete absence of any agreement among Defendants to act in concert to boycott Plaintiffs.

   C.   <u>Opportunities to Conspire Fail to Show Agreement.</u>

   Plaintiffs allege that there have been numerous "opportunities for Defendants to conspire," citing trade association memberships for some of the Moving Defendants.  <u>See id.</u> ¶¶ 422-444. These bare allegations, however, are insufficient to demonstrate any alleged agreement among the Defendants:

> The class posits that PM, RJR, B&W and Lorillard enjoyed numerous opportunities to conspire, and that this supports their collusion claim. We unambiguously held in Todorov, however, that "the mere opportunity to conspire among antitrust defendants does not, standing alone, permit the inference of conspiracy." 921 F.2d at 1456 (<u>citing</u> <u>Bolt v. Halifax Hosp. Med. Ctr.</u>, 891 F.2d 810, 827 (11th Cir.1990), <u>overruled in part on other grounds</u> by <u>City of Columbia v. Omni Outdoor Adver.</u>, 499 U.S. 365, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991)). Indeed, the opportunity to fix prices without any showing that appellees actually conspired does not tend to exclude the possibility

that they did not avail themselves of such opportunity or, conversely, that they actually did conspire. Appellants may not rely on this proposition to support their allegations in this case.

Williamson Oil, 346 F.3d at 1319. These allegations regarding diverse trade association memberships do nothing to show an agreement.[4]

II.     PLAINTIFFS' CLAIMS OF TORTIOUS INTERFERENCE WITH BUSINESS (COUNT III) AND UNJUST ENRICHMENT (COUNT IV) SHOULD BE DISMISSED WITH PREJUDICE.

Both remaining state law claims (Tortious Interference with Business Relations and Unjust Enrichment) should be dismissed for failure to allege any act by any Defendant with regard to any Plaintiff.  Counts III and IV do not mention a single Defendant, a single Plaintiff, or a single customer.  See FAC ¶¶ 543-562.  Nor do allegations in Count III or Count IV incorporate any specific allegations from the FAC.  This resort to shotgun pleading is precisely the pleading defect the Court pointed out in its June 11, 2014 initial dismissal of the A&E Complaint (A&E Doc. 110).

In its Order dated April 27, 2015 adopting the Report and Recommendation, the Court expressly instructed Plaintiffs, yet again, that shotgun pleading was unacceptable:

Magistrate Judge Smith concluded that the generalized nature of the Plaintiffs' contentions does not satisfy the applicable pleading standard, which requires facts showing that the Defendants prevented identifiable third parties from entering into a business relationship with any Plaintiff. (Doc. 109 at 15-16). The Plaintiffs contend that this is an impractical pleading standard because it seeks to compel them to

---

[4] Going from baseless speculation to desperation, Plaintiffs offer some investment theory in Blackrock as a supposedly "plausible" explanation.  FAC ¶¶ 456-478.

> produce information "which is peculiarly within the possession and
> control of the Defendants." (Doc. 112 at 13). But there is nothing in the
> Complaint that explains why the Defendants, but not the Plaintiffs,
> would have this information. Surely the Plaintiffs must have some basis
> to believe that certain Defendants interfered with certain of the
> Plaintiffs' customers. A general allegation that some unidentified
> Defendants – or all Defendants – interfered with some unidentified
> customers of some unnamed Plaintiff does not satisfy the requirements
> of <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009).

April 27, 2015 Order at 2 (Doc. 118).  Despite repeated dismissals and repeated

instructions from the Court, Plaintiffs have chosen to repeat their shotgun and group

pleading.

A.      The Tortious Interference Claim Is Deficient.

Plaintiffs have failed to identify any specific incidents of alleged steering as to

most of the Defendants.  Instead, Plaintiffs offer but a handful of terse allegations of

purported "steering" regarding only a few Defendants, none of which are sufficient to

meet Plaintiffs' pleading burden.  FAC ¶¶ 343-420.  As to the majority of the

Defendants, Plaintiffs say nothing at all, confirming that Plaintiffs have no facts to

support claims against them.  This type of generalized group pleading has been

repeatedly rejected.  <u>See</u> Report and Recommendations, No. 14-md-2557, at 39

(Doc. 192) ("Omnibus R&R").

More broadly, Louisiana law recognizes only a narrowly-defined claim for

tortious interference with business relations. <u>See, e.g.</u>, <u>JCD Marketing Co. v. Bass</u>

<u>Hotels and Resorts, Inc</u>., 812 So.2d 834, 841 (La. Ct. App. 2002). "Louisiana

jurisprudence has viewed the claim [of tortious interference with business relations]

with disfavor and limited the cause of action by imposing a malice element which

17

requires the plaintiff to show that the defendant acted with actual malice." Hardy v.
Easterling, 113 So.3d 1178, 1186-87 (La. Ct. App. 2013); see also Bogues v.
Louisiana Energy Consultants, Inc., 71 So.3d 1128, 1135 (La. Ct. App. 2011).

In the Report and Recommendation, Magistrate Judge Smith recognized that
Louisiana views the requirements of the tort more narrowly than other jurisdictions
precisely because of the malice requirement:

> Louisiana courts have explained that the malice element requires that
> the plaintiff show that the defendant's conduct was motivated by
> "'spite,'" "'ill will,'" or "'bad feelings,'" rather than the pursuit of profits.
> Bogues, 46,434, p. 12, 71 So.3d at 1135; (quoting JCD Marketing,
> 2001-1096, p. 12, 812 So.2d at 841). Louisiana, unlike some other
> states, requires the plaintiff to show malice, and does not appear to
> allow tortious interference claims based on improper means alone.

R&R at 14 (Doc. 109).  See also CheckPoint Fluidic Systems Intern., Ltd. v.
Guccione, No. 10–4505, 2011 WL 3268386, at *11 (E.D.La. July 28, 2011) ("The
malice element 'seems to require a showing of spite or ill will, which is difficult (if not
impossible) to prove in most commercial cases with profit motive present.'").

In the Complaint, Plaintiffs make only general, conclusory allegations
regarding all Defendants' supposed malicious intent.  See, e.g., FAC ¶¶ 545-551. In
fact, in this entire section, not a single Defendant is named.  Id.  These wholly
conclusory allegations, without even the most minimal of factual support, are
insufficient.  Ocean Mexicana, S.A. DE C.V. v. Cross Logistics, Inc., NO. 2:13-CV-
06657, 2014 WL 2441103, at *5 (E.D.La. May 30, 2014) (dismissing claim because
"the plaintiff has not alleged any facts that tend to show defendant acted with actual
malice" and made only a conclusory allegation of malice); see also Bogues, 71

18

So.3d at 1135 (dismissing claim because "[f]irst, there are no factual allegations describing any conversation between a particular plaintiff/lessor and any particular entity with whom LEC was attempting to conduct a business relationship."); CheckPoint Fluidic Systems, 2011 WL 3268386, at *11 (dismissing claim because "defendants have not supplied any specifics about the challenged conduct that would permit the Court to distinguish between legitimate business conduct grounded in the protection of a legitimate interest and impermissible interference").  See also See Omnibus R&R at 39.

Further, the Moving Defendants have contracts with their insureds, and thus any alleged "interference" with any business relationship (prospective or otherwise) between any of the Defendants and their insureds would be privileged.  See Gunder's Auto Center v. State Farm Mut. Auto. Ins. Co., 422 Fed. App'x 819, 822 (11th Cir. 2011) ("as insurance companies are not strangers to the relationship between an auto-body shop and an insured, the insurer's acts are privileged and it cannot be held liable for tortious interference.").  In fact, the 11th Circuit in Gunder's held that even assuming the falsity of alleged slanderous statements made by an insurer to its insured regarding a body shop were privileged and could not give rise to a tortious interference claim.  Id. at 822-23.  This claim should be dismissed with prejudice.

B.    The Unjust Enrichment Claim Is Deficient.

Plaintiffs have chosen to plead unjust enrichment as if they never read this Court's sua sponte Order dismissing the original complaint in that A&E case:

19

> With limited exceptions, the allegations of wrongdoing are attributed, collectively, to every Defendant and alleged to have been perpetrated upon every Plaintiff. While there may be situations in which such collective descriptions are sufficient, at least some of claims asserted here require individualized allegations.  For example, if Plaintiffs' counsel were able to establish that Defendant A was unjustly enriched by shortchanging Plaintiff B, it would not entitle any other plaintiff to a judgment against Defendant A (or any other defendant). However, that is the way this action has been pleaded. If the Plaintiffs choose to replead, this must be corrected.

Order, A&E (Doc. 110) at 2.  The FAC still improperly alleges that all Plaintiffs were harmed by all Defendants without providing any specifics as repeatedly instructed by this Court.

Moreover, and fundamental to any claim of unjust enrichment is the existence of "an enrichment." Drs. Bethea, Moustoukas and Weaver LLC v. St. Paul Guardian Ins. Co., 376 F.3d 399, 407 (5th Cir. 2004).  The Complaint alleges that the benefit – the repair of damaged vehicles – was provided, not to Defendants, but to their insureds "by providing to these policyholders and claimants collision repair services." FAC ¶ 107.  Thus, any services provided by the Plaintiffs would have enriched third-party insureds and not the insurer.

Notwithstanding the Court's repeated instructions, Plaintiffs still fail to identify any benefit that any Plaintiff conferred upon any Moving Defendant.  It is well settled that the body shop confers a benefit to the insured, not the insurer.  A&E, 2015 WL 304048, at *5 ("The repairs at issue obviously provided a benefit to the owners of the vehicles.  But so far as the FAC discloses, the only effect of such a repair on the insurance company is the incurring of an obligation to pay for it."); Indiana Autobody Association, Inc. v. State Farm Mutual Automobile Ins. Co., No. 6:14-cv-6001 (Doc.

150 at 3 (M.D. Fla. Mar. 30, 2015) (ordering dismissal on same ground).  See also,

Adventist Health System / Sunbelt Inc. v. Med. Savings Ins. Co., No. 6:03-cv-1121-

Orl-19KRS, 2004 WL 6225293, at *6 (M.D. Fla. Mar. 8, 2004) ("[A] third-party

providing services to an insured confers nothing on the insurer except, a ripe claim

for reimbursement, which is hardly a benefit.").  As the defendant received no

benefit, the unjust enrichment claim must be dismissed.  See, e.g., Treen Const.

Co., Inc. v. Schott, 866 So.2d 950, 956 (La. App. Ct. 2004).

Likewise, there is nothing unjust or unexpected when the body shop

repeatedly performs repairs knowing what insurers would pay.  Gray v. McCormick,

663 So.2d 480, 486 (La. App. Ct. 1995) (stating that a "justified expectation of gain"

is a necessary element of unjust enrichment).  See also Omnibus R&R at 26.

Moreover, the repair of the automobile for the owner is subject to a contract

between the body shop and the owner, regardless of whether the owner has an

additional contractual right for the insurer to pay for the services rendered to the auto

owner.  Plaintiffs were paid for their work under their contracts; they simply want

more money for the work they already performed.  See Omnibus R&R at 27 (citing 1

Dobbs, Law of Remedies § 4.9(4)).  Because there is a contract governing the

repair, Plaintiffs cannot state a claim for unjust enrichment.  Morphy, Makofsky &

Masson, Inc. v. Canal Place 2000, 538 So.2d 569, 572 (La. 1989) ("[T]he existence

of a claim on an express or implied contract precludes application of [unjust

enrichment], for there does not exist one of the latter's requirements, that there be

no other remedy available at law...."); St. Paul Guardian, 376 F.3d at 408 ("Louisiana

21

law provides that no unjust enrichment claim shall lie when the claim is based on a

relationship that is controlled by an enforceable contract.").

Additionally, the existence of DRP contracts between the Plaintiffs and

Defendants bars this claim.  Having seen many of their carbon-copy state law claims

dismissed because of the allegation of DRP contracts between Plaintiffs and

Defendants, Plaintiffs now go out of their way to offer legal conclusions disguised as

fact allegations asserting that the "DRP agreements are not enforceable contracts."

FAC ¶ 175.  See also id. ¶¶ 176-177.  Legal conclusions, however, are to be ignored

in determining the adequacy of a complaint.  Twombly, 550 U.S. at 555, Iqbal, 556

U.S. at 678; Joseph v. Bernstein, No. 14–13989, --- Fed.Appx. ---, 2015 WL

2190849, at *3 (11th Cir. 2015).

Notwithstanding their attempts to plead away these DRP agreements, the

FAC identifies a number of duties of performance:

> At present, Defendant insurers with direct repair programs require a
> shop to not only accept fixed prices on labor, fixed prices on paint and
> materials, fixed pricing  procedures on parts, refusal to compensate or
> fully compensate for processes and  procedures, but many compel the
> shop to include the DRP sponsor as an additional insured on the
> shop's liability insurance (even though the sponsor holds no lien or
> other ownership interest), compel indemnification for liability assessed
> to the sponsor, compel primary assumption of liability for repairs using
> parts provided by or insisted upon by the sponsor, compel mandatory
> production of the shop's financial information and books upon demand,
> and authority to obtain background checks upon the shop's employees
> at the sponsor's will and pleasure.

FAC ¶ 171.  See also id. ¶ 185 ("the insurers have independently contracted with

parts suppliers as required in DRP agreements.); id. ¶ 341 ("Most DRP terms . . .

require the shop to not only maintain an extensive liability policy with the DRP

sponsor as a named insured. . . ."). And while Plaintiffs now contend that the

insurers have no duties under these DRP agreements (id. ¶ 175), Plaintiffs obviously

perceived a benefit in entering into these agreements to become, what they have

characterized as "preferred shops."  FAC ¶ 415, 416.[5]

III.    THE ENTIRE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE.

Plaintiffs have no right to file yet another Complaint. "The district court . . .

need not 'allow an amendment (1) where there has been undue delay, bad faith,

dilatory motive, or repeated failure to cure deficiencies by amendments previously

allowed; (2) where allowing amendment would cause undue prejudice to the

opposing party; or (3) where amendment would be futile."  Corsello v. Lincare, Inc.,

428 F.3d 1008, 1014 (11th Cir. 2005).

On April 27, 2015, this Court ordered Plaintiffs to file an amended pleading

not more than 21 days after the date of the Order.  Order (Doc. 118).  The FAC was

filed on May 21, 2015, three days after the deadline.  While the Court can forgive the

untimely filing of an amended complaint as excusable neglect or inadvertence under

Rule 6(b), the practice of Plaintiffs' Counsel in repeatedly disregarding Court-

_____

[5] Beyond arguing that these DRP agreements are not really contracts, Plaintiffs
attempt to change their allegations by now declaring that "Many Plaintiffs have
associated with DRPs from time to time over the last twenty years, though the
majority have since left all such programs."  Id. ¶167.  But, a significant number of
Plaintiffs still are DRP shops.  See, e.g., Bradshaw's (id. ¶ 199); Jim's (id. ¶ 202);
Adams (id. ¶ 203); LeJeune's (id. ¶ 204); Brouillette's (id. ¶ 205); C&C (id. ¶ 206);
Complete (id. ¶ 207); Martin's (id. ¶ 213); Tony's (id. ¶ 214); Country Club (id. ¶
217); Final Touch (id. ¶ 218); Keith's (id. ¶ 219); Antley's (id. ¶ 220).  Again,
Plaintiffs' continued resort to group pleadings precludes this claim on behalf of all
Plaintiffs against all Defendants.

Ordered filing deadlines is contemptuous.  See, e.g., R&R (Doc. 109) (noting that

"Plaintiffs failed to file a timely response to several" Motions to Dismiss in this action;

Second Amended Complaint in A&E (Doc. 296) (filed on February 11, 2015 despite

Order (Doc. 291) to file amended pleading by Feb. 10, 2015).  See also Motion to

Strike Amended Complaint in Indiana Autobody Association, No. 14-cv-6001 (Doc.

153).  There can be no question that the Court has the inherent power to dismiss

this Complaint with prejudice based on the need to manage its docket, particularly in

an MDL.  Dinardo v. Palm Beach County Circuit Court Judge, 199 Fed. App'x 731,

735 (11th Cir. 2006) ("A court may dismiss a case with prejudice based on . . . the

court's inherent power to manage its docket.").  Moreover, the Court can require

Plaintiffs' counsel to pay the attorneys' fees of Defendants' counsel in having to

move to dismiss the amended complaint as a sanction under 18 U.S.C. § 1927 for

repeatedly ignoring the Court's instructions on pleading requirements and filing

deadlines.  See Omnibus R&R dated June 3, 2015 (Doc 192) (identifying multiple

cases where Plaintiffs continue to ignore the pleading instructions of the Court).

Although this is technically Plaintiffs' first Amendment, Plaintiffs have been on

notice of the problems with these allegations repeatedly throughout this MDL

proceeding.  Copy-cat complaints were first filed in January 2014, and not a single

complaint of the twenty-eight (28) that the Eaves law firm has filed to date in the

approximately 20 MDL cases has survived a motion to dismiss.  In its orders in A&E

dismissing the original and First Amended Complaint (A&E (Docs. 110, 291)), and

the numerous Report and Recommendations (and Orders adopting the Report and

Recommendations) in other constituent cases doing the same (see, e.g., Brewer Body Shop, LLC v. State Farm Mutual Auto. Ins. Co., __ F. Supp. 3d __, 2015 WL 1911418 (M.D. Fla. Apr. 27, 2015)), this Court has already provided clear instructions to the Plaintiffs as to how to cure their pleading deficiencies. They have chosen to ignore those instructions, and Defendants should not be forced to incur the expense of drafting motions to dismiss complaints which Plaintiffs either cannot, or will not, remedy.

Plaintiffs have had nearly a year to draft a complaint that satisfies Twombly and the Federal Rules of Civil Procedure. They have still failed to do so, and should not be granted yet another try. Thus, the FAC should be dismissed as to the Moving Defendants with prejudice.[6]

## CONCLUSION

For the reasons set forth herein it is requested that this Court dismiss the First Amended Complaint with prejudice.


Dated June 8, 2015                              Respectfully submitted,

_____

[6] See, e.g., Aquatherm Industries, Inc. v. Florida Power & Light Co., 145 F.3d 1258, 1264 (11th Cir. 1998) (affirming dismissal with prejudice because "we conclude Aquatherm can prove no set of facts in support of its claims which would entitle it to relief under the federal antitrust laws "); Ivanovic v. Overseas Mgmt. Co., No. 11-80726-CIV, 2011 WL 5508824, at *4 (S.D.Fla., Nov. 09, 2011) ("As Plaintiff fails to . . . satisfy basic federal pleading standards, the Amended Complaint must be dismissed as to all eight moving Defendants for failure to state a claim. Such dismissal should be with prejudice because Plaintiff has already once been granted an opportunity to amend and it is apparent that any further amendment would be futile.").

By: /s/ Thomas G. Rohback
Thomas G. Rohback
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT 06103
Phone: (860) 275-8100
Facsimile: (860) 275-8101
trohback@axinn.com

Attorneys for Defendants Hartford
Accident and Indemnity Company,
incorrectly named in the Complaint as
"Hartford Accident and Indemnity
Insurance Company"; Hartford Casualty
Insurance Company; Hartford Fire
Insurance Company; and Hartford
Insurance Company of the Midwest


BERNARD, CASSISA, ELLIOTT &
DAVIS

Professional Law Corporation
BY: s/Howard B. Kaplan
HOWARD B. KAPLAN (Louisiana Bar
#14414)
3838 N. Causeway Blvd., Suite 3050
Metairie, Louisiana 70002
Telephone:  (504) 834-2612
Facsimile: (504) 838-9438
Email: hkaplan@bcedlaw.com

COUNSEL FOR:
UNITED FIRE AND CASUALTY
COMPANY AND UNITED FIRE &
INDEMNITY COMPANY


By:      /s/ Jeffrey R. Seewald

JEFFREY R. SEEWALD
Texas State Bar No. 17986640
McGlinchey Stafford, PLLC

/s/  Eric Hochstadt
David L. Yohai (admitted pro hac vice)
John P. Mastando III (admitted pro hac vice)
Eric Hochstadt (admitted pro hac vice)
WEIL GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  212-310-8000
Facsimile:  212-310-8007
Email:  david.yohai@weil.com
Email:  john.mastando@weil.com
Email:  eric.hochstadt@weil.com

Counsel for Defendants 21st Centennial
Insurance Company, 21st Century North
America Insurance Company, and Farmers
Insurance Exchange


/s/ Michael E. Mumford

Ernest E. Vargo, Admitted Pro Hac Vice
evargo@bakerlaw.com
Michael E. Mumford, Admitted Pro Hac Vice
mmumford@bakerlaw.com
BAKERHOSTETLER LLP
PNC Center, Suite 3200
1900 East 9th Street
Cleveland, OH 44114-3482
Telephone (216) 621-0200
Facsimile (216) 696-0740

*Counsel for Defendants Liberty Mutual Fire
Insurance Company, Liberty Mutual
Insurance Company, Safeco Insurance
Company of America, and Safeco Insurance
Company of Oregon*


/s/ Christopher C. Skambis

Christopher C. Skambis
The Skambis Law Firm
720 Rugby Street, Suite 120

1001 McKinney Street, Suite 1500
Houston, Texas 77002
Phone:   713-520-1900
Fax:      713-520-1025
Email:   jseewald@mcglinchey.com

ANTHONY J. ROLLO
Louisiana State Bar No. 01133
McGlinchey Stafford, PLLC
301 Main Street, 14th Floor
Baton Rouge LA 70801
Phone:   225-383-9000
Fax:      225-343-3076
Email:   arollo@mcglinchey.com

RANDY R. DOW
Florida Bar No. 121118
McGlinchey Stafford PLLC
One East Broward Blvd., Suite 1400
Fort Lauderdale FL 33301
Phone:   954-356-2501
Fax:      954-333-3847
Email:   rdow@mcglinchey.com

Counsel for USAgencies Casualty
Insurance Company, Inc.

Orlando, Florida 32804
Telephone: 407-649-0090
Facsimile: 407-649-0191
Cell: 321-303-0284
Email: cskambis@skambislaw.com

Counsel for Defendant Safeway Insurance
Company of Louisiana

/s/ R. Bradley Best
R. Bradley Best (MS Bar# 10059)
HOLCOMB DUNBAR WATTS BEST
MASTERS & GOLMON, PA
P.O. Drawer 707
400 South Lamar, Suite A
Oxford, MS 38655
Tel: (662) 234-8775
Fax: (662) 238-7552
bradbest@holcombdunbar.com

Gregg A. Wilkes (LA Bar# 20419)
Cook, Yancey, King & Galloway, APLC
P.O. Box 22260, Shreveport LA 71120
(318) 227-7723
Gregg.wilkes@cookyancey.com

/ s/ James K. Ordeneaux
Andrew Plauché, Jr. (LA Bar No. 11023)
James Keith Ordeneaux (LA Bar No. 28179)
Elizabeth Atwell Babin Carville (LA Bar No. 27949)
PLAUCHÉ MASELLI PARKERSON LLP
701 Poydras St., Suite 3800
New Orleans, LA 70139
Telephone (504) 586-5275
Facsimile: (504) 582-1172
Email: aplauche@pmpllp.com
Email: jordeneaux@pmpllp.com
Email: acarville@pmpllp.com

Attorneys for Louisiana Farm Bureau
Casualty Insurance Company

27

Counsel for Defendants Shelter General
Insurance Company and Shelter Mutual
Insurance Company


/s/ Michael H. Carpenter

Michael H. Carpenter
Michael N. Beekhuizen
David J. Barthel
Carpenter Lipps & Leland LLP
280 Plaza, Suite 1300
280 North High Street
Columbus, Ohio 43215
(614) 365-4100 telephone
(614) 365-9145 facsimile
carpenter@carpenterlipps.com
beekhuizen@carpenterlipps.com
barthel@carpenterlipps.com

Mark J. Botti
Squire Patton Boggs (US) LLP
1200 19th Street, N.W., Suite 300
Washington, District of Columbia  20036
(202) 626-6600 telephone
(202) 626-6780 facsimile
mark.botti@squirepb.com

Attorneys for Defendant Nationwide
Mutual Insurance Company


/s/ Jeffrey S. Cashdan
Jeffrey S. Cashdan, admitted pro hac
vice
Claire C. Oates, admitted pro hac vice
KING & SPALDING LLP
1180 Peachtree Street, NE
Atlanta, Georgia 30309
Telephone:  (404) 572-4600

 /s/ Seth A. Schmeeckle

Seth A. Schmeeckle, Trial Counsel
Louisiana Bar No. 27076
Lugenbuhl, Wheaton, Peck, Rankin
& Hubbard, A Law Corp.
601 Poydras Street, Suite 2775
New Orleans, LA 70130
Telephone:  (504) 568-1990
Fax:  (504) 310-9195
sschmeeckle@lawla.com

and

Marjorie M. Salazar
Florida Bar No. 0939021
Lugenbuhl, Wheaton, Peck, Rankin
& Hubbard, A Law Corp.
815 Walker St., Suite 1447
Houston, TX 77002
Telephone:  (713) 222-1990
Fax:  (713) 222-1996
msalazar@lawla.com

ATTORNEYS FOR DEFENDANTS
THE HANOVER INS. CO. &
THE HANOVER AMERICAN INS. CO.

Facsimile:  (404) 472-5139
jcashdan@kslaw.com
coates@kslaw.com

/s/ Michael R. Nelson
Michael R. Nelson, admitted pro hac vice
Kymberly Kochis, admitted pro hac vice
Francis X. Nolan, admitted pro hac vice
Sutherland Asbill & Brennan LLP
1114 Avenue of the Americas, 40th Floor
New York, NY 10036-7703
Telephone:  (212) 389-5068

michael.nelson@sutherland.com
kymberly.kochis@sutherland.com
frank.nolan@sutherland.com

Counsel for Defendants Progressive
Security Insurance Company and
Progressive Paloverde Insurance
Company

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 8th day of June, 2015, I electronically filed

the foregoing with the Clerk of the Court by using the CM/ECF system which will

send a Notice of Electronic Filing to all counsel of record that are registered with the

Court's CM/ECF system.


/s/ Thomas G. Rohback
Thomas G. Rohback
(*pro hac vice*)
AXINN, VELTROP & HARKRIDER
LLP
90 State House Square
Hartford, CT 06103
Phone: (860) 275-8100
Facsimile: (860) 275-8101
trohback@axinn.com