**IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF FLORIDA, ORLANDO DIVISION**

PARKER AUTO BODY, INC., *et al.*,      \*
      \*
      PLAINTIFFS,      \* MDL Docket No. 2557
      \*
v.      \* Case No. 6:14-cv-06004-GAP-TBS
      \*
STATE FARM MUTUAL AUTOMOBILE      \* Originally filed in the Western District
INSURANCE COMPANY, *et al.*,      \* of Louisiana
      \*
      DEFENDANTS.      \***DISPOSITIVE MOTION**

**CERTAIN DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' FIRST AMENDED COMPLAINT**

      The  Defendants listed in **Exhibit A** ("Defendants") move pursuant to Fed. R. Civ. P.

12(b)(6) to dismiss Plaintiffs' First Amended Complaint ("FAC") with prejudice.[1]

**MEMORANDUM OF LAW**

**I.      INTRODUCTION**

      The *Parker* Plaintiffs' allegations in support of their federal antitrust claims fail for

the same reasons as the antitrust claims in the second amended Florida, Indiana and Missis-

sippi complaints.  Unlike the original *Parker* Complaint ("Original Complaint"), the FAC

offers some detailed allegations.  However, the detail cannot salvage the implausible conspir-

acy and boycott theories Plaintiffs repeat in every complaint.  The FAC (i) continues to rely

on allegations of unilateral conduct and conscious parallelism that cannot give rise to claims

under Section 1 of the Sherman Act, 15 U.S.C. § 1; (ii) fails to correct the legal deficiencies

identified by this Court in its March 10 Order in this case (Doc. 109, *adopted* Doc. 118) and

in its January 22, 2015 Order dismissing the first amended complaint in the companion *A&E*

---

[1] The FAC was filed May 21, 2015, after expiration of the Court's May 18 deadline. (Doc. 118 at 4.)

*Auto Body* case (*see A&E*, Doc. 293, adopted in this action at Doc. 109 at 18 and Doc. 118 at 3); and (iii) continues Plaintiffs' pattern of impermissible group pleading.  The key features of the FAC are summarized below:

- Plaintiffs have never alleged an express agreement among Defendants to set body shop reimbursement rates.

- The FAC relies on allegations that various Defendants, at different times, chose to follow some State Farm labor and material rate <u>increases</u>. Those allegations underscore State Farm's unilateral conduct followed by some parallel reimbursement conduct on the part of some Defendants in some periods of time.

- The FAC purports to allege "plus factors," such as opportunities to conspire and profit seeking, but these allegations are substantively indistinguishable from the same conclusory allegations previously rejected by the Court.  Plaintiffs' quixotic new theory that some Defendants have various relationships with the investment and asset management firm BlackRock lacks any factual or logical connection to a conspiracy claim.

- To support their group boycott claim, Plaintiffs have added a handful of allegations of purported steering conduct by a few Defendants.  Plaintiffs assert that these allegations of steering, which purportedly began ten years ago, support their sweeping claim that all Defendants have engaged in an unlawful boycott.  There are, however, no factual allegations to support the claim that all Defendants conspired to refuse to deal with Plaintiff shops. The FAC fails even to allege conduct that could fairly be described as parallel.  Moreover, the FAC does not state a boycott claim for the same fundamental reason that the previous iterations fell short – vaguely asserted isolated examples of purported steering by individual insurers are not equivalent to a *concerted* refusal to deal.  Indeed, the allegations make clear that these Plaintiffs continue to do business with Defendants, so there has clearly been no "boycott" at all.

- Plaintiffs have larded the FAC with apparent new claims that Defendants have conspired to fix the prices of replacement parts and to require shops to use aftermarket, salvaged, or recycled parts.  Plaintiffs do not tie any of these allegations to any agreement among Defendants regarding reimbursement rates or otherwise; they fail even to allege parallel conduct.  These allegations also employ the same collective pleading technique which the Court has previously rejected.

This is the most recent of numerous iterations of essentially identical conspiracy claims filed in this and other actions in this MDL brought by the same counsel as in this case.

Each iteration attempts to build on, add to, revise, or delete allegations in prior iterations to attempt to remedy failings identified by the Court or to respond to or evade arguments raised by Defendants in their prior motions to dismiss.  Yet, after more than a year of trying, Plaintiffs continue to fall far short of "nudg[ing]" their antitrust conspiracy claims "across the line from conceivable to plausible."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  It is clear now that, no matter how many tries they get and no matter how many pages of allegations they draft, Plaintiffs cannot state a claim for antitrust conspiracy against Defendants. Plaintiffs' Sherman Act claims therefore should be dismissed with prejudice.

Plaintiffs' state law claims should likewise be dismissed with prejudice:

- Plaintiffs' second attempt to state a claim for tortious interference with business relations fails to remedy the deficiencies of their Original Complaint.  Plaintiffs continue to rely primarily on conclusory and generalized group pleading.  As this Court has recognized, such collective pleading is insufficient to state a claim.  No specific allegations of tortious interference are made against the majority of Defendants.  Moreover, Plaintiffs' limited allegations regarding specific transactions simply demonstrate Plaintiffs' inability to allege key elements of tortious interference, including malice.

- Plaintiffs' second attempt to plead an unjust enrichment claim is just as legally insufficient as their previous attempt.  Plaintiffs' claim fails because Plaintiffs have not enriched or conferred a benefit upon Defendants and there has been no impoverishment of Plaintiffs.

## II.   PLAINTIFFS' ANTITRUST CLAIMS (COUNTS ONE AND TWO) SHOULD BE DISMISSED[2]

### A.   Plaintiffs' New Conspiracy Allegations Fail to Overcome the Shortcomings of Their Original Complaint

To survive a motion to dismiss, a plaintiff alleging an antitrust conspiracy must adequately plead that the defendants "(1) entered into 'a contract, combination or

---

[2] Defendants hereby adopt and incorporate the legal standards for a Rule 12(b)(6) motion set out in the Court's March 10, 2015 Report and Recommendation (Doc. 109 at 5-6, *adopted* Doc. 118).

conspiracy,' which was (2) 'in restraint of trade or commerce' and (3) that [the plaintiff] was damaged by the violation." *Moecker v. Honeywell Int'l, Inc.*, 144 F. Supp. 2d 1291, 1300 (M.D. Fla. 2001) (citation omitted).  Plaintiffs still fail to satisfy the first prong of this test because they have not alleged a plausible conspiracy among all or any Defendants.

The FAC must, but does not, contain "'allegations plausibly suggesting (not merely consistent with) [a conspiracy or] agreement,'" *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1332-33 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 557), and must, but does not, offer "'enough factual matter (taken as true) to suggest that an agreement was made.'" *A&E*, Doc. 293 at 17 (quoting *Twombly*, 550 U.S. at 556).  Allegations "that are 'consistent with conspiracy, but just as much in line with . . . rational and competitive business strategy' are insufficient." *In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1308 (S.D. Fla. 2010) (quoting *Twombly*, 550 U.S. at 554).  "'[F]ormulaic recitations' of a conspiracy claim" are insufficient, and "'a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.'" *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1294 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 557).

1.     **The FAC's Allegations of Conscious Parallelism Do Not Suggest a Conspiracy to Fix Reimbursement Rates**

Plaintiffs allege that Defendants imposed maximum labor rates for automobile repair services.    The "'crucial question,'" however, remains "whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express.'" *Twombly*, 550 U.S. at 553; *see also Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1298-99 (11th Cir. 2003) ("[I]t is important to distinguish at the outset between

4

collusive price fixing, i.e., a 'meeting of the minds' to collusively control prices, which is prohibited under the Sherman and Clayton Acts, and 'conscious parallelism,' which is not.").

Like its predecessor, and the companion *A&E*, *Indiana AutoBody*, and *Capitol Body* second amended complaints, the FAC fails to meet the standards set by the Supreme Court and the Eleventh Circuit for pleading an antitrust conspiracy.  The rate-fixing conspiracy alleged in the Original Complaint was based entirely on Plaintiffs' general characterization of Defendants' conduct as conscious parallelism, without so much as a single factual allegation that there were parallel rate reimbursement levels set by any Defendants.  The FAC adds some allegations of episodic instances in which some, but not all, Defendants paid similar prices for repairs.  This Court has already explained, however, that such parallel conduct "falls short of conclusively establishing agreement or itself constituting a Sherman Act offense."  *A&E*, Doc. 293 at 16.  In dismissing the antitrust conspiracy claims in the *A&E* case, this Court noted that, "aside from conclusory allegations that it exists, the Plaintiffs offer no details at all in the Amended Complaint about the alleged agreement, such as how the Defendants entered into it, or when." *Id.* at 17.

Plaintiffs have not cured these defects.  They still do not offer any factual allegations to support the conclusion that there was a conspiracy among the Defendants.  There are no allegations as to who reached an agreement with whom, what that agreement entailed, or when it began or ended.  Their allegation that the supposed parallel conduct has been going on for at least 20 years (FAC ¶ 271) merely underscores the implausibility of their conspiracy theory.  None of the newly added allegations in the FAC, separately or in context, raise a suggestion of a preceding agreement among Defendants to fix reimbursement rates.  There is

no factual context to suggest that Defendants agreed with State Farm or among themselves to adopt State Farm's rate reimbursement levels.  Indeed, Plaintiffs' core allegation remains the self-defeating generalization that after State Farm, the alleged market leader, unilaterally developed and adopted a price structure for labor rates, other Defendants at some point thereafter individually refused to pay any more than State Farm.

Plaintiffs do not allege sufficient factual matter to place this conduct in a "context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."  *Twombly*, 550 U.S. at 557.  Thus, there are no factual allegations supporting an inference that the parallel reimbursement rates resulted from a preceding agreement among the Defendants.  Because conclusory allegations and recitals of the elements of a cause of action are not presumed true at the pleading stage, *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), Plaintiffs have not, and plainly cannot, set forth factual allegations plausibly establishing an antitrust conspiracy.

On examination, even Plaintiffs' allegations of supposed parallel business conduct reflect inconsistent behavior among Defendants.  For instance, they claim that State Farm determined that the market rate in Bossier City was $48 per hour in 2011, but they allege that only 14 of the 56 other Defendants paid the same rate to Plaintiff Krystal Auto.  (FAC ¶¶ 257-59.)  In another instance, Plaintiffs allege that eight Defendants <u>raised</u> their reimbursement rates within one to two months of State Farm changing its rates in 2013.  (*Id.* ¶ 269.)  (Other Defendants, apparently, did not follow State Farm's rate changes at all.)

Flunking basic deductive logic, Plaintiffs surmise from these inconsistent instances of parallelism that the rates paid by State Farm "could only have been provided by State Farm's

6

internal and unpublished numbers to the other Defendants." (*Id*. ¶ 270.) Plaintiffs do not account for why, in service of a purported scheme to suppress reimbursement rates, Defendants would gradually raise their rates, over a period of weeks or months, in response to State Farm's announcement of its own independent rate increase. They also do not allege when, how, by what means or to whom State Farm provided such information to the other Defendants or that other Defendants agreed to use the same rates, nor do they allege that any Defendants possessed this information before State Farm raised the rates it paid to shops.[3]

State Farm is alleged to be the market leader (FAC ¶ 119) and to unilaterally set the prices it will pay for repairs based on its regularly conducted survey (*see id*. ¶¶ 237-45). Merely following a price leader is common within different industries and does not suggest the existence of an agreement. *See In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 910 (6th Cir. 2009) (explaining that, "'as will often be the case, the leader's price increase is likely to be followed'" and concluding that "each defendant's decision to match a new commission cut was arguably a reasoned, prudent business decision" (citation omitted)); *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) ("merely charging, adopting or following the fees set by a Consortium is insufficient as a matter of law to constitute a violation of Section 1 of the Sherman Act"); *Quality Auto Body, Inc. v. Allstate Ins. Co.*, 660 F.2d 1195, 1200 (7th Cir. 1981) (conspiracy not inferable from Defendants' "adherence to a 'common formula' for calculating damage estimates" for automobile repairs).

Plaintiffs focus many allegations on State Farm's surveys, but they do not allege that

---

[3] Tellingly, Plaintiffs' claim that "[t]he Defendants all raise their 'market rates' contemporaneously or within days of State Farm raising their rates" (FAC ¶ 518) actually refers to eight Defendants agreeing to pay higher rates 30-60 days after State Farm began paying higher rates to body shops. (*See id*. ¶ 269.)

State Farm's surveys involved anything other than State Farm's unilateral conduct or that any Defendant implemented a price change before State Farm implemented its survey results. (FAC ¶ 237.)  Plaintiffs allege that State Farm acted to protect the confidentiality of its surveys (*id.* ¶¶ 254-55), not that it used the surveys to communicate with other Defendants about rates.  In any event, the other Defendants did not need to know that information or to conduct their own surveys to know what State Farm and other insurers actually paid body shops.

As in *Twombly*, there are obvious explanations for why rational and self-interested insurers would know the rates paid by their competitors.  Plaintiffs allege that Defendants engage with Plaintiffs and with other body shops in hundreds of transactions every day in the ordinary course of business.  The rates body shops are paid are an integral part of these transactions.  Body shops doing business with State Farm across Louisiana, including Plaintiffs, all would learn in the ordinary course of business what rates State Farm was willing to pay them, just as they would know the rates paid by other insurers with whom they do business.  Moreover, these rates allegedly are static for years at a time.  (FAC ¶ 489.) Thus, it is both obvious and entirely reasonable that the rates State Farm paid were well known among both body shops and the insurers with whom they regularly transact, and that alleged knowledge does not suggest a conspiracy.

Plaintiffs' contention that the other Defendants "cannot be cognizant of any purported changes in the market" and that the data "could only have been provided by State Farm to its ostensible competitors" is plainly wrong.  (*Id.* ¶ 524, 268.)  Shops would have been told the rates resulting from the State Farm survey, if not the methodology, when State Farm told them what rates it was willing to pay.  (*See, e.g.*, *id.* ¶¶ 248, 258, 261, 263, 267, 269.)  Plain-

tiffs' allegations also suggest that insurers would learn competitive pricing information in the implementation of DRP agreements, which purportedly require pricing concessions or most favored nations provisions that oblige shops to charge no more than what other insurers pay for the same services.  (FAC ¶¶ 164, 169, 176.)  Thus, it is likely if not inevitable that State Farm's rates would be known among both body shops and the insurers with whom those shops did business.  *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007) ("Similar contract terms can reflect similar bargaining power and commercial goals (not to mention boilerplate); similar contract language can reflect the copying of documents that may not be secret; similar pricing can suggest competition at least as plausibly as it can suggest anticompetitive conspiracy . . . . ").

Moreover, in a case purporting to be about a conspiracy to suppress rates, the FAC's sole factual allegation of parallel price moments involves Defendants <u>increasing</u> rates, to the benefit of body shops, not decreasing them.  (FAC ¶ 269.)  The body shops themselves obviously knew what rates State Farm was paying them and almost certainly would have been eager to tell other insurers refusing to pay more than the market leader that the market leader had increased the rates it was willing to pay.  *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 329 (3d Cir. 2010) ("The details of commission agreements with other insurers, for example, could be a powerful tool for a broker attempting to negotiate a more favorable agreement with a particular insurer-partner.").  The decisions of those insurers to increase their own rates after State Farm had increased its own market rate hardly indicate the presence of an agreement to suppress the rates (and in any event certainly did not prejudice Plaintiffs).  *See In re Travel Agent*, 583 F.3d at 907 (refusing to infer conspiracy where Defend-

ants were not alleged to have received information about rate reductions before they were implemented).  If anything, this example tends to show that pricing movements in the market are the result of independent rather than concerted action.

Moreover, "'the practice of the insurance companies to calculate the reimbursement for its insured based upon the lowest prevailing price in the market place (and to insure the integrity of that estimate by having an open list of competing shops which will generally accept it) is the very essence of competition.'"  *Quality Auto,* 660 F.2d at 1205 (citation omitted); *see also In re Baby Food Antitrust Litig.,* 166 F.3d 112, 126 (3d Cir. 1999) ("Gathering competitors' price information can be consistent with independent competitor behavior."); *In re Citric Acid Litig.,* 191 F.3d 1090, 1103 (9th Cir. 1999) ("There are many legal ways in which Cargill could have obtained pricing information on competitors.").[4]

In short, Plaintiffs' factual allegations of quasi-parallel conduct permit no inference other than that it was in the rational, independent business interests of State Farm to demand lower prices and of the other Defendant insurers to refuse to permit a body shop to charge them more than the shop was charging State Farm.  *See Twombly,* 550 U.S. at 554 (allega-

---

[4] Presumably referring to – and mischaracterizing – allegations contained in other complaints discussing supposed statements by a USAA representative in Oklahoma, Plaintiffs allege that "Defendant representatives from other states have specifically stated that State Farm sends out its survey results to other insurers which prompts changes in the fixed labor rates paid to body shops." (FAC ¶ 524.)  The actual allegation to which Plaintiffs refer claims that a single USAA representative told an Oklahoma body shop that USAA would soon pay *higher* labor rates because State Farm survey results "had just been sent out" and it would "take USAA a couple of weeks to put them in motion."  (*See Indiana AutoBody,* No. 6:14-cv-06001, Doc. 151 (Second Am. Compl.) ¶ 182.)  This allegation concerns a rate increase, so even taken at face value, it offers Plaintiffs little help. Moreover, the initial allegations do not include facts that explain how the purported statement is relevant to rates outside Oklahoma, who sent these results, or when and to whom, or how general dissemination of the results supports an inference of conspiracy.  In short, the inference Plaintiffs insist must be drawn simply does not flow from the words that allegedly were said to some unidentified body shop employee in Oklahoma, nor is there any factual support for such an inference.

tions that are "consistent with conspiracy, but just as much in line with . . . rational and competitive business strategy" do not suffice).   In dismissing the Complaint, this Court adopted its analysis of the factually indistinguishable allegations in the *A&E Auto Body* case, where it ruled that Plaintiffs' allegations of purported statements by insurers that they would pay no more than State Farm did not give rise to an inference of a prior agreement:

> It is not illegal for a party to decide it is unwilling to pay a higher hourly rate than its competitors have to pay, and the fact that a number of the Defendants made statements to that effect does not tip the scales toward illegality. . . . Without more, statements such as these suggest that the party is acting out of its own economic self-interest rather than because of an agreement to fix prices, as required to violate § 1. . . .   Plaintiffs themselves suggest that the Defendants might have been acting in response to perfectly lawful motivations.

*A&E*, Doc. 293 at 18.   Plaintiffs have not provided any new allegations in the FAC that would alter this conclusion in the present case.[5]

### 2.   The FAC Does Not Allege Any Factual Plus Factor Supporting a Plausible Inference of Conspiracy

The FAC provides no details regarding the supposed agreement or any "specific time, place, or person involved in the alleged conspiracies."   *See Twombly*, 550 U.S. at 565 n.10. Plaintiffs also do not offer any "plus factors" that might make it plausible to infer a conspiracy from the alleged parallel conduct.   *See id.* at 556 n.4 (discussing examples of plus factor

---

[5] Plaintiffs now allege that an unidentified "State Farm employee" stated that "'every iota'" of the Louisiana Attorney General's action against State Farm "'is the truth . . . . when you read [the complaint], it's like, that "that's us."'"   (FAC ¶ 251.)   This purported recitation of the employee's personal opinion is too vague to provide any indication of which allegations this unspecified employee supposedly thinks are accurate or why the employee should be supposed to have any knowledge of the truth or falsity of any particular allegations.   Moreover, the action brought by the Attorney General of Louisiana alleges unilateral conduct by State Farm and asserts only unfair trade practices and an intra-corporate conspiracy among State Farm entities (which is not a cognizable conspiracy under federal antitrust law, *see Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984)), not a conspiracy between State Farm and any outside insurance companies.   This supposed admission thus gets Plaintiffs no closer to satisfying their pleading obligations than they were before.

allegations that might suffice to plead conspiracy); *Williamson Oil Co.*, 346 F.3d at 1301 ("[P]rice fixing Plaintiffs must demonstrate the existence of 'plus factors' that remove their evidence from the realm of equipoise and render that evidence more probative of conspiracy than of conscious parallelism."). Plaintiffs simply recycle, at somewhat greater length, the conclusory allegations this Court previously rejected.

a.    Opportunities to Conspire (FAC ¶¶ 421-44)

In support of their theory that 57 different insurers conspired to fix the prices they would agree to pay for auto repairs throughout Louisiana, Plaintiffs point to Defendants' membership in various trade associations and standard-setting organizations. (*See* FAC ¶¶ 422-44.) Unspecified meetings of these associations, Plaintiffs speculate, could have served as opportunities for high-level executives and officers of Defendants to get together and form a conspiracy. (*See id.* ¶¶ 425, 427-28, 433, 439.)

Contrary to Plaintiffs' claims, mere opportunities to conspire at trade association meetings do not plausibly suggest an agreement, particularly where the Defendants had an independent, rational reason to be at the alleged meeting place. *See Am. Dental Ass'n*, 605 F.3d at 1295 ("participation in trade organizations provides no indication of conspiracy"); *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 349 (affirming dismissal where "neither defendants' membership in the CIAB, nor their common adoption of the trade group's suggestions, plausibly suggest conspiracy"); *In re Travel Agent*, 583 F.3d at 911 ("[A] mere opportunity to conspire does not, standing alone, plausibly suggest an illegal agreement because [Defendants'] presence at such trade meetings is more likely explained by their lawful, free-market behavior."). As this Court has explained, the fact that "State Farm and unnamed

12

members of the 'insurance industry' meet regularly does not suggest that any Defendant insurance company entered into a price-fixing agreement." *A&E*, Doc. 293 at 17 n.11.[6]

Moreover, Plaintiffs have not alleged facts that could have created an opportunity to conspire in the first place. They do not list or describe a single meeting of any of these associations, who attended, when it occurred, what contacts or communications occurred, or how any of these unspecified contacts or communications might be substantively, temporally, or causally related to any of the purported parallel conduct that Plaintiffs allege. *See In re Travel Agent*, 583 F.3d at 910 (affirming dismissal where complaints did "not cite any specific meetings that involved both [Defendants]").[7]

b.    <u>Common Motive to Conspire (FAC ¶¶ 445-78)</u>

As before, the only motive Plaintiffs offer for the alleged price-fixing conspiracy is that it would be profitable for Defendants to pay less for repairs. (*See* FAC ¶ 445.) A profit motive is not sufficient to articulate a common motive to conspire. *See, e.g.*, *White v. R.M.*

---

[6] Plaintiffs allege that "Defendant insurers meet regularly and State Farm has disclosed the Defendant insurers discuss and strategize with each other payment of body shop charges at these regular meetings." (FAC ¶ 524.) The FAC contains no allegations elaborating on this supposed disclosure. Presumably, Plaintiffs are referring to allegations contained in companion complaints concerning a State Farm meeting with representatives of the Mississippi Department of Insurance and body shop representatives, at which a State Farm employee allegedly referred to monthly insurance industry meetings and said that he would raise the body shops' concerns at these meetings. This Court already has dismissed these allegations as supporting neither Plaintiffs' characterization of the allegations here nor the inference of conspiracy Plaintiffs seek to draw. *See A&E*, Doc. 293 at 17 n.11.

[7] Only seven Defendants are members of the American Insurance Association (FAC ¶¶ 422-23), and only seven are members of the Property Casualty Insurers Association of America (*id.* ¶¶ 423-24). Only four are alleged to be members of the Certified Automotive Parts Association ("CAPA") (*id.* ¶ 438), which also includes body shop members – making its attractiveness as a conspiracy-planning location doubtful at best. Only two are alleged to be members of the National Association of Mutual Insurance Companies ("NAMIC"). (*Id.* ¶ 424.) State Farm, which purportedly plays "a leading role" in the conspiracy (*id.* ¶ 120), belongs only to CAPA, NAMIC, and the Insurance Institute for Highway Safety ("IIHS"). (*Id.* ¶¶ 424, 432, 438.) Contrary to Plaintiffs' allegation (*id.* ¶ 504), NAMIC is not a party to the 1963 Consent Decree. (*See* Doc. 119-5.)

13

*Packer Co.*, 635 F.3d 571, 582 (1st Cir. 2011) ("Taking as a given that all of the defendants had motive to conspire with one another to earn high profits, all such a motive shows is that the defendants could reasonably expect to earn higher profits by keeping prices at a supracompetitive level through parallel pricing practices.").

As this Court noted in dismissing the Complaint, the parallel pricing conduct alleged by Plaintiffs is in the independent, profit-maximizing self-interest of each Defendant insurer, which renders Plaintiffs' conspiracy claim implausible.  *See A&E*, Doc. 293 at 18; *see also Jacobs*, 626 F.3d at 1342 ("Jacobs had the burden to present allegations showing why it is more plausible that TPX and its distributors—assuming they are rational actors acting in their economic self-interest—would enter into an illegal price-fixing agreement (with the attendant costs of defending against the resulting investigation) to reach the same result realized by purely rational profit-maximizing behavior.").

In the FAC, Plaintiffs have attempted to piece together a tenuous theory that some Defendants were somehow incentivized to conspire because they have relationships with BlackRock.  (FAC ¶¶ 453-80.)  Specifically, Plaintiffs allege that six Defendants invest "in or through" BlackRock, an asset management firm that manages over $4.32 trillion.  (*Id.* ¶¶ 455-56.)  Plaintiffs claim, among other things, that Defendants profit by steering customers to a collision repair multi-shop operator, Service King, which was purportedly purchased from Carlyle Group by BlackRock.  (*Id.* ¶ 457.)  Plaintiffs' allegations rest on a blatant misstatement of fact.  Service King was purchased from Carlyle Group by Blackstone – not

101230140.1

BlackRock.[8]  Defendants suggest no further response to the Service King-related allegations could possibly be warranted, but even if it were not blatantly false, this allegation hardly suggests a common motive to conspire to set reimbursement rates.

Plaintiffs' concoction of the BlackRock scheme continues, however.  They also allege that BlackRock owns shares of a paint manufacturer, PPG Industries, and a supplier of recycled parts, LKQ Corporation.  (FAC ¶¶ 463, 471.)  Plaintiffs claim that Defendants somehow share a motive to conspire, for reasons that are unclear, "through increased sales of the products sold by" PPG and LKQ.  (*Id.* ¶¶ 468, 477.)  Plaintiffs' contrived theory includes no allegation of how Defendants coordinated or could have coordinated their collision repair decisions through BlackRock, and no allegation that they had any say in BlackRock's investment decisions.  Moreover, Plaintiffs do not allege that any Defendants have required that a specific type of paint be used, let alone PPG's paint, or that all Defendants require that LKQ's recycled parts must be used for repairs.  (*Id.* ¶¶ 463-77.)

### c.    Action Against Self-Interest (FAC ¶¶ 481-84)

The FAC adds no coherent allegations that would show why, absent an agreement, it would be irrational for an insurer to ask body shops to lower their labor rates to the levels

---

[8] *See* Blackstone, *Press Release: Blackstone to Acquire Majority Stake in Service King Collision Repair Centers* (July 23, 2014), http://blackstone.com/news-views/press-releases/details/blackstone-to-acquire-majority-stake-in-service-king-collision-repair-centers; Service King, *Press Release: Blackstone Acquires Majority Share of Service King Collision Repair Centers* (July 21, 2014), http://serviceking.com/news/67-blackstone-acquires-majority-share-of-service-king-collision-repair-centers.  The Court may take judicial notice of these press releases and articles under Fed. R. Evid. 201 because the ownership of Service King is not subject to reasonable dispute, is generally known, and can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned.  *See Ritter v. Hughes Aircraft Co.*, 58 F.3d 454, 458-59 (9th Cir. 1995) (taking judicial notice of facts in a newspaper article because they would be generally known and easily verified); *Peters v. Del. River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1357 (3d Cir. 1994) ("we take judicial notice of newspaper accounts highlighting controversies over the DRPA's toll increases, spending practices, and public announcements.").

101230140.1

they charge a different insurer.  *See Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995) ("buyers try to bargain for low prices, by getting the seller to agree to treat them as favorably as any of their other customers" and "that is the sort of conduct that the antitrust laws seek to encourage").  Defendants set the amounts they will pay to reimburse for repairs regardless of which body shop their policyholders choose, and Plaintiffs concede that even when a shop wants to charge higher rates, Defendants simply refuse to reimburse for the higher charges.  (*See, e.g.*, FAC ¶¶ 179, 191-93, 272, 305, 318.) Plaintiffs offer nothing to suggest that the ability or decision of a Defendant to refuse to pay these higher prices depended on the actions of other insurers.

        **3.**      **Plaintiffs' New Allegations Regarding Prices of Replacement Parts, Types of Parts Used, and Reimbursement Policies for Various Repair Procedures Do Not Set Forth a Price-Fixing Claim**

Plaintiffs have added or expanded a number of allegations concerning Defendants' payments for replacement parts (as distinguished from body labor or paint and materials rates), certain repair processes and procedures, and requirements for use of allegedly "substandard or dangerous" replacement parts.  (FAC ¶¶ 110, 276.)[9]  The FAC does not tie any of these allegations to any agreement by Defendants regarding parts reimbursement rates or policies.  To the contrary, these new allegations only underscore differences among the alleged reimbursement practices and parts replacement decisions of Defendants, rendering any al-

---

[9] The FAC is also replete with a catalog of other body shop grievances concerning matters having no apparent logical relationship to Plaintiffs' claims.  Examples include DRP indemnity agreements (FAC ¶¶ 171, 173, 187-88, 341), "desk review" claims processes (*id.* ¶ 297), and disclosures of aftermarket parts.  (*Id.* ¶¶ 328-37.)  These irrelevant allegations of various supposed practices by different insurers also are inconsistent with any notion of parallel conduct by Defendants.

leged conspiracy or agreement implausible.[10] *See In re Elevator Antitrust Litig.*, 502 F.3d at 50-51 (affirming dismissal of claim that Defendants conspired to fix the various terms of elevator repair parts and services for failure to show any parallel conduct in the first place).

Plaintiffs' suggestion that their allegations entitle them to discovery that will enable them to repair the deficiencies in their claim (FAC ¶ 275) is wholly unwarranted. In the absence of "allegations that reach the level suggesting conspiracy" and of any "'reasonably founded hope that the [discovery] process will reveal relevant evidence' to support a § 1 claim," allowing this case to proceed to enormously expensive antitrust discovery would contravene the dictates of *Twombly*. 550 U.S. at 559-60 (alteration in original) (citation omitted). Indeed, given Plaintiffs' "repeated failure to cure deficiencies by amendments previously allowed," *Goldstein v. MCI WorldCom*, 340 F.3d 238, 254 (5th Cir. 2003), Plaintiffs' antitrust conspiracy claims should be dismissed with prejudice as a matter of law.

**B.      The FAC's Boycott Allegations Are Insufficient As a Matter of Law**

Count Two should be dismissed for the independent reason that Defendants' alleged conduct does not constitute a group boycott as a matter of law. A group boycott under the antitrust laws requires proof of a "concerted *refusal*" to deal. *Quality Auto Body*, 660 F.2d at

---

[10] With respect to the type of replacement parts the shops are required to use, some Defendants write estimates specifying the use of "aftermarket" (non-OEM) parts. (FAC ¶ 141.) Other Defendants allegedly specify salvage parts. (*Id.*) Yet other Defendants are "exceptions." (*Id.*) With respect to parts procurement, some Defendants require parts to be ordered through the Parts Trader electronic marketplace. (*Id.* ¶¶ 142-43.) Other Defendants order the parts themselves and ship them to the body shop. (*Id.* ¶ 146.) Still others tell the body shop which part to order from which vendor. (*Id.*) With respect to reimbursement practices, Plaintiffs allege that Defendants base their estimates on different estimating software programs or independent appraisers. (*Id.* ¶¶ 285-88.) Defendants' decisions to reimburse for certain procedures also are based on different methods and appear to vary depending on the circumstances. (*See id.* ¶¶ 292, 294-95, 297-99.) Such pervasive variations hardly support even the FAC's general allegations of parallel conduct, much less give rise to a plausible inference of conspiracy or agreement.

1206 (emphasis added); *Mendelovitz v. Adolph Coors Co.*, 693 F.2d 570, 577 (5th Cir. 1982). The conduct that Plaintiffs allege in apparent support of their boycott claim includes a smattering of allegations that a few Defendants attempted to steer policyholders to non-plaintiff shops or told certain of their policyholders not to take their cars to certain body shops.  Steering is not equivalent to a refusal to deal and, accordingly, cannot support a boycott claim.[11]  Allegations concerning the purported impact of the alleged misconduct – for example, that Plaintiff Advantage Collision's revenue from State Farm business declined from 2013 to 2015 (FAC ¶¶ 400-02) – contradict the notion that even individual Defendants refused to deal with Plaintiffs.  Moreover, the allegations concerning Advantage clearly suggest why its volume of business declined:  That shop left State Farm's DRP program in 2013 and was no longer a "preferred provider" receiving referrals.  (*Id.* ¶ 400.)

In addition, as discussed above, there is no legally cognizable allegation of concerted action with respect to the alleged steering.  *See A&E*, Doc. 293 at 21 ("Plaintiffs offer even less 'evidence' of an agreement to boycott than they did of an agreement to fix prices.").  The FAC offers no facts to support the claim that 57 different insurers agreed to refuse to deal with Plaintiffs in hundreds or thousands of transactions, much less any detail about when,

---

[11] *See also Quality Auto Body*, 660 F.2d at 1206 (even if two insurers agreed to refuse to pay more than competitive price for automobile repairs, that agreement did not constitute a boycott); *Custom Auto Body, Inc. v. Aetna Cas. & Sur. Co.*, 1983 WL 1873, at *19 (D.R.I. Aug. 3, 1983) (body shop "at all times has been free to compete for the business of the defendant and its insureds by offering lower prices or higher quality services"); *Nationwide Mut. Ins. Co. v. Auto. Serv. Councils of Del., Inc.*, 1981 WL 2053, at *2-4 (D. Del. Apr. 10, 1981) (discouraging insureds from using body shops "by telling them that their prices were too high, and by notifying the owners that Nationwide would not guarantee full reimbursement" did not constitute refusal to deal; there was "no suggestion of an outright refusal of Nationwide to deal with any repair shop," rather Nationwide had "simply refused to accede to what it considers to be defendants' excessive prices").  Plaintiffs cannot cure the deficiencies of their boycott claim by invoking the word "coerce."  (FAC ¶ 534.)  None of the alleged conduct comes close to coercion.  *See Nationwide Mut.*, 1981 WL 2053, at *3 ("driving a hard bargain . . . hardly constitutes a form of 'coercion' cognizable under the antitrust laws").

how, or with whom agreements were or could have been made. Their only "evidence" to support the existence of such an agreement – that other Defendants allegedly steered business away from some Plaintiffs in the months or years after those Plaintiffs dissociated from other insurers' direct repair programs and therefore must have engaged in the steering to punish the shops – is a speculative interpretation of clearly insufficient allegations of parallel conduct.

## III. PLAINTIFFS' CLAIM FOR TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS (COUNT THREE) SHOULD BE DISMISSED

Plaintiffs' claim for tortious interference with business relations fails as a matter of law. Louisiana recognizes only a narrow cause of action for tortious interference with business relations. *See, e.g., Junior Money Bags, Ltd. v. Segal*, 970 F.2d 1, 11 (5th Cir. 1992) (tortious interference with business relations is a "very limited form of recovery" in Louisiana). "Louisiana jurisprudence has viewed [such a claim] with disfavor." *JCD Mktg. Co. v. Bass Hotels & Resorts, Inc.*, 812 So. 2d 834, 841 (La. Ct. App. 2002). To state a claim for tortious interference with business relations, a plaintiff must allege that the defendant "acted with actual malice" and that the defendant "actually prevented the plaintiff from dealing with a third party." *Henderson v. Bailey Bark Materials*, 116 So. 3d 30, 37 (La. Ct. App. 2013). As this Court has stated, "Louisiana courts have explained that the malice element requires that the plaintiff show that the defendant's conduct was motivated by 'spite,' 'ill will,' or 'bad feelings,' rather than the pursuit of profits."[12] (Doc. 109 at 14.) Louisiana "does not appear to allow tortious interference claims based on improper means alone." (*Id.*)

---

[12] "It has been extremely difficult for plaintiffs to bear the burden of showing that bad feelings rather than just profit motivated the defendant; '[i]n fact, there appear to be no reported cases in which anyone actually has been held liable for the tort'" under Louisiana law. *Ocean Mexicana, S.A. de C.V. v. Cross Logistics, Inc.*, 2014 WL 2441103, at *5 (E.D. La. May 30, 2014) (citation omitted).

In dismissing Plaintiffs' Original Complaint, the Court stated that Plaintiffs "have not alleged facts showing that Defendants 'prevented' any identifiable third party from entering into a business relationship with any Plaintiff that would have been consummated but for the interference" and that Plaintiffs had alleged only "generalized interference in [their] business interests." (*Id.* at 16.)  In the FAC, Plaintiffs have attempted to remedy that deficiency by including allegations regarding "[s]pecific examples" of purported tortious interference. (FAC ¶¶ 349-73.)  As a threshold matter, Plaintiffs' alleged specific instances of purported interference include only 6 of the 57 Defendants and only 5 of the 40 Plaintiffs.  (*See* Exhibit B hereto.)  Given the Court's requirement of specific pleading by each Plaintiff against each Defendant, the vast majority of Plaintiffs' tortious interference claims fail as a matter of law. (*See id.*)  Moreover, 13 of Plaintiffs' 15 purported examples of tortious interference were *unsuccessful* in that the customer chose to patronize a Plaintiff's shop despite the alleged conduct.  (*See id.*; *see also* FAC ¶¶ 350-51, 352, 354-55, 356-57, 358, 359, 360-61, 362-65, 366, 368, 369, 370-71, 372-73.)[13]  Such allegations cannot state a claim for tortious interference as a matter of law.  *See Henderson*, 116 So. 3d at 37 (defendant must have "actually prevented the plaintiff from dealing with a third party").

Moreover, Plaintiffs' allegations regarding specific instances of unsuccessful interference do not show malice.  These specific instances do not include allegations of "implications of unethical conduct" or other disparagement by Defendants.  Alleged statements that a

---

[13] As to 11 of the examples of alleged interference that was unsuccessful, Plaintiffs expressly allege that the customer went to the Plaintiff's shop.  In the remaining two examples, Plaintiffs fail to specify where the customer ended up getting his or her car repaired and thus fail to allege the required element that the Defendant in question "actually prevented" a customer's transaction with a Plaintiff. (*See* FAC ¶¶ 350-51, 369.)

20

Defendant does not warranty the work of a non-DRP shop (*e.g.*, *id.* ¶¶ 354, 359), that a Plaintiff was "not on our list" (*id.* ¶ 363), that a DRP shop "could be paid directly" by the insurer (*id.* ¶ 351), or that an insured might be responsible for non-covered charges by a non-DRP shop (*id.* ¶ 352), in addition to being accurate, are not disparagement and are not evidence of malice as defined by Louisiana courts.  Likewise, Plaintiffs' allegations that insurers made advantageous offers on rental cars when an insured went to a DRP (*id.* ¶ 358) or that a claim representative "smirked" when an insured stated she wanted to go to Plaintiff Auto Body Specialist (*id.* ¶ 352) do not rise to the level of malice.  Nor does Plaintiffs' allegation that a claims representative told an insured that Plaintiff Parker is "difficult" and "would not agree with [the insurer's] appraiser" establish malice.  (*Id.* ¶ 366.)  To the contrary, the entire FAC demonstrates that Parker does not agree with Defendants' car repair appraisals, and Plaintiffs' allegation shows only genuine disagreement over prices and repair procedures, not malice.

Plaintiffs allege only two instances where customers actually decided not to patronize a Plaintiff's shop.  (*See id.* ¶¶ 353, 367.)  Neither of these two instances includes allegations that would support the element of malice.  In the first instance, State Farm is merely alleged to have "pressured Ms. Bryant [the insured] to take her vehicle elsewhere to the point Ms. Bryant felt she was required to take her vehicle to a State Farm preferred shop, which she did." (*Id.* ¶ 353.)  In the second, it is alleged that "Progressive told Ms. Jones [the insured] that Bradshaw's was not one of its network shops and she would have to tow the vehicle to Courtesy Chevrolet for repairs." (*Id.* ¶ 367.)  These allegations do not support Plaintiffs' generalized contention that in each of their examples the Defendant insurer attempted inter-

ference by improper means such as "false statements, misrepresentations, implications of un-

ethical conduct by the Plaintiff or play[ing] upon the financial vulnerability of the consum-

er." (*Id.* ¶ 375.)[14]

Plaintiffs' generalized, conclusory allegations of malice (*id.* ¶¶ 377-97), which are

similar to those in the Original Complaint, do not remedy the deficiency in pleading malice.

Most of these allegations do not name any specific Defendants, but attribute "malice" to De-

fendants generically.  As such, they are insufficient as a matter of law.  (*See* Doc. 109 at 14-

16.)  For example, Plaintiffs assert that "[i]n each instance, the Defendant insurer refused to

pay the full cost of repairs, either by refusing to pay the posted labor rates, refusing to pay for

necessary procedures or processes, utilizing salvaged parts or aftermarket parts instead of

OEM parts designed to fit a particular vehicle, capping paint and materials or similar activi-

ties, or a combination of these actions."  (FAC ¶ 377.)  This allegation, framed in the disjunc-

tive, does not permit any particular Defendant to know which of the alleged acts it is sup-

posed to have engaged in.  Moreover, this and the many other such allegations have no bear-

ing on malice for purposes of Plaintiffs' tortious interference claims.  This allegation de-

scribes conduct in repair transactions with Plaintiffs, not conduct attempting to prevent in-

sureds from dealing with Plaintiffs.   In addition, the allegation clearly describes conduct

aimed at reducing Defendants' costs for repairs.  Such profit-related conduct does not support

a tortious interference claim as a matter of Louisiana law.  (*See* Doc. 109 at 14 (citing *Bogues*

*v. La. Energy Consultants, Inc.*, 71 So. 3d 1128, 1135 (La. Ct. App. 2011)).)

---

[14] As this Court has acknowledged, allegations of the use of "improper means" is not sufficient under
Louisiana law to state a claim for tortious interference.  (Doc. 109 at 14.)

Plaintiffs further allege that Defendants' purported "steering" of their insureds to DRP shops is a "financially pointless endeavor" and "does not benefit a demonstrably legitimate interest of Defendants" because Defendants pay non-DRP shops the same rates that it pays DRP shops.  (FAC ¶¶ 378-79.)  Therefore, according to Plaintiffs, the practice must be malicious or improper.  (*Id.*)  Plaintiffs' conclusory assertion is flatly inconsistent with their own allegations that Defendants have established DRP programs to control costs and prices throughout the car repair industry.  (*Id.* ¶¶ 163-71 (describing "Role of Direct Repair Programs"); *id.* ¶ 109 (Defendants "control and depress automobile damage repair costs to the detriment of Plaintiffs and the substantial profit of the Defendants").)  It is also inconsistent with Plaintiffs' own characterization of themselves as "non-compliant" and as "shops who refused to comply with Defendants' fixed pricing structures [and] parts procurement rules designed to minimize cost."  (*Id.* ¶ 417.)[15]

For all these reasons, Plaintiffs' claim for tortious interference with business relations fails as a matter of Louisiana law and should be dismissed with prejudice.

## IV.   PLAINTIFFS' CLAIM FOR UNJUST ENRICHMENT (COUNT FOUR) SHOULD BE DISMISSED

Plaintiffs' second attempt to plead an unjust enrichment claim fails to plausibly allege

---

[15] In alleging malice, Plaintiffs also improperly rely on an affidavit submitted in *Price's Collision Center, LLC v. Progressive Hawaii Insurance Co.*, a case pending in Tennessee, not Louisiana. (FAC ¶¶ 391-93.)  As Plaintiffs concede, Progressive Hawaii, the defendant in *Price's*, is not a Defendant here.  Plaintiffs' blanket allegation that other Progressive entities that are Defendants in this case "have acted in the same manner as set out in Mr. Edwards' affidavit" (*id.* ¶ 393) is unsupported by any specific allegations of such acts by those Defendants and does not show malice by Progressive or any other Defendant.  Likewise, Plaintiffs' allegation that an unidentified employee stated that "it is State Farm's goal to drive independent body shops out of business" and "turn all repair business over to MSOs [i.e. chains]" is not connected to any specific transaction and, by Plaintiffs' own allegation, is motivated by "economic benefit," not malice.  (*See id.* ¶ 394.)  Plaintiffs also allege that a State Farm employee expressed the view that steering is legal in Louisiana.  (*Id.* ¶ 395.)  An alleged belief in the legality of conduct does not show malice.

23

required elements of an unjust enrichment.  First, Plaintiffs have not plausibly pled the essential element of "an enrichment on the part of the defendant."  *See Edwards v. Conforto*, 636 So. 2d 901, 907 (La. 1994).  Under the guise of group pleading, the FAC alleges that the repairs Plaintiffs performed "benefitted and enriched Defendants and Defendant's [sic] insured/claimants for whom Defendants are required to provide payment for repairs."[16] (FAC ¶ 556.)  However, the FAC  makes clear that the purported benefit – repairs to motor vehicles – was furnished by Plaintiffs not to Defendants but rather to their insureds "by providing to these policyholders and claimants motor vehicle collision repair services."  (*Id.* ¶ 107.)  As the Court has stated, "the repairs of insureds' vehicles at issue "obviously provided a benefit to the owners of the vehicles.  But so far as the Amended Complaint discloses, the only effect of such a repair on the insurance company is the incurring of an obligation to pay for it."  (*A&E*, Doc. 293 at 9.)  An obligation to pay is hardly a benefit to the insurers or enrichment.  (*Id.*)[17]

Second, Plaintiffs cannot establish the essential element of an "impoverishment" of the Plaintiffs.  *See Edwards*, 636 So. 2d at 907.   "[I]mpoverishment can be shown 'only when the factual circumstances show that the impoverishment was not a result of the plaintiffs' own fault or negligence or was not undertaken at [their] own risk.'"  *Dorsey v. N.*

---

[16] Plaintiffs' reliance on impermissible group pleading flatly contravenes the Court's Orders directing Plaintiffs to provide "individualized allegations" to support their state law claims such as unjust enrichmentt.  (*See A&E*, Doc. 110 ¶ 4; *A&E*, Doc. 293 at 6 & n.8.)  In their FAC, Plaintiffs entirely fail to provide the individualized factual allegations necessary to show that the elements of unjust enrichment are met with respect to any of the individual repair transactions at issue.  Plaintiffs' continued failure to plead with the required specificity warrants dismissal of their unjust enrichment claim for this reason alone.

[17] Moreover, even to the extent that an obligation to pay could be construed as a "benefit," it is "certainly not something that has been conferred . . . by the repair shop."  (*A&E*, Doc. 293 at 10.)

24

*Life Ins. Co.*, 2005 WL 2036738, at *23 (E.D. La. Aug. 15, 2005) (citation and emphasis omitted).   Here, as shown by Plaintiffs' own allegations,[18] "Defendants' repeated and persistent refusal to pay the amounts demanded by Plaintiffs makes unreasonable any expectation on the part of Plaintiffs that Defendants would abruptly begin paying the amounts Plaintiffs believe their services are worth." (*Capitol Body*, No. 6:14-cv-06000, Doc. 82 at 10, *adopted*, Doc. 83.)   Thus, "[i]f Plaintiffs were unhappy with the prices Defendants were paying, they could have negotiated higher prices before performing the repairs or failing that, refused to perform repairs for Defendants' insureds." (*Id.*)   Nonetheless, Plaintiffs chose to keep performing repairs for Defendants' insureds despite "kn[owing] Defendants would not pay what they were asking for." (*In re: Auto Body Shop Antitrust Litig.*, No. 6:14-md-2557, Doc. 192 (Report & Recommendations) at 26.)   Accordingly, Plaintiffs cannot show that they were subjected to unwarranted "impoverishment," and their unjust enrichment claim should be dismissed for this additional reason.

## V.      CONCLUSION

After two tries, it is apparent that any further amendment of Plaintiffs' Complaint would be futile.  The Court should dismiss all of Plaintiffs' claims against Defendants with prejudice.  *See Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005); *Postell v. Fifth Third Bank*, 2013 WL 2042805, at *1 (M.D. Fla. May 15, 2013) (amended complaint dismissed with prejudice where it failed to cure identified deficiencies in prior complaint).

---

[18]  According to the FAC, Defendants made clear to auto body shops the amounts they were willing to pay for the services to be rendered. (*See, e.g.*, FAC ¶¶ 109-10, 171-72, 179-81, 185-89.) Furthermore, Plaintiffs' allegations make clear that the same or similar DRP agreements and pricing practices have existed for many years and are well known to body shops. (*See, e.g, id.* ¶¶ 163-172, 494-508.)

Dated:  June  8, 2015                             Respectfully submitted,

_/s/ Johanna W. Clark_
Johanna W. Clark
CARLTON FIELDS JORDEN BURT, P.A.
450 S. Orange Ave., Suite 500
Orlando, Florida 32801
Telephone: (407) 849-0300
Facsimile: (407) 648-9099
Email: jclark@cfjblaw.com

Michael L. McCluggage
EIMER STAHL LLP
224 South Michigan Avenue, Suite 1100
Chicago, Illinois 60604
Telephone: (312) 660-7600
Facsimile: (312) 692-1718
E-mail: mmcluggage@eimerstahl.com

Michael P. Kenny
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: 404-881-7000
Facsimile: 404-881-7777
Email: mike.kenny@alston.com

_Attorneys for Defendants State Farm Mutual
Automobile Insurance Company, State Farm
Fire and Casualty Company, and State
Farm General Insurance Company_

*/s/ Richard L. Fenton*
Richard L. Fenton (admitted pro hac vice)
Mark L. Hanover (admitted pro hac vice)
Dentons US LLP
233 South Wacker Drive, Suite 5900
Chicago, Illinois 60606
Tel:  (312) 876-8000
Fax: (312) 876-7934
Email: richard.fenton@dentons.com
Email: mark.hanover@dentons.com

Bonnie Lau
Dentons US LLP
525 Market Street, 26th Floor
San Francisco, CA 94105-2708
Telephone:  (415) 882-5000
Facsimile:  (415) 882-0300
bonnie.lau@dentons.com

Lori J. Caldwell (Florida Bar No. 026874)
Rumberger, Kirk & Caldwell, PA
300 S Orange Ave, Suite 1400
PO Box 1873
Orlando, FL 32802-1873
Tel:  (407) 839-4511
Fax: (407) 835-2011
Email: lcaldwell@rumberger.com

*Attorneys for Defendants Allstate Property
and Casualty Insurance Company, Allstate
Fire and Casualty Insurance Company,
Allstate Indemnity Company, Allstate
Insurance Company, Encompass Indemnity
Company, Encompass Insurance Company
of America, Encompass Property and
Casualty Company, and Esurance Insurance
Company*

101230140.1

*/s/ Timothy J. Rooney*
Timothy J. Rooney (admitted pro hac vice)
Norman K. Beck (admitted pro hac vice)
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
Telephone: (312) 558-5600
Facsimile: (312) 558-5700
trooney@winston.com
nbeck@winston.com

Laura Besvinick
STROOCK & STROOCK & LAVAN LLP
200 South Biscayne Boulevard
Suite 3100
Miami, Florida 33131
Telephone: (305) 789-9300
Facsimile: (305) 789-9302
lbesvinick@stroock.com
Fla. Bar No. 391158

*Counsel for Defendants Travelers Casualty
and Surety Company, Travelers Casualty
and Surety Company of America, Travelers
Casualty Insurance Company of America,
The Travelers Indemnity Company of
America, The Travelers Indemnity Company
of Connecticut, The Travelers Indemnity
Company, and Travelers Property Casualty
Company of America*

*/s/ E.K. Cottrell*
E.K. Cottrell (Fla. Bar No: 0013579)
EMAIL: ecottrell@sgrlaw.com
SMITH, GAMBRELL & RUSSELL, LLP
50 N. Laura Street, Suite 2600
Jacksonville, FL  32202
Telephone:   (904) 598-6100
Facsimile:   (904) 598-6300

*Attorneys for Defendants Sentry Insurance A
Mutual Company, and
Sentry Select Insurance Company*

*/s/Hal K. Litchford*
Hal K. Litchford (272485)
**BAKER, DONELSON, BEARMAN,**
**CALDWELL & BERKOWITZ, PC**
SunTrust Center
200 South Orange Avenue
Post Office Box 1549
Orlando, Florida  32802
Telephone:  (407) 422-6600
Facsimile:  (407) 841-0325
Email*:  hlitchford@bakerdonelson.com*

*-and-*

Amelia W. Koch *(Admitted Pro Hac Vice)*
Steven F. Griffith, Jr. *(Admitted Pro Hac Vice)*
**BAKER DONELSON BEARMAN**
**CALDWELL & BERKOWITZ, PC**
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana  70170
Telephone:  (504) 566-5200
Facsimile:  (504) 636-4000
Email:  akoch@bakerdonelson.com
Email:  sgriffith@bakerdonelson.com

*Counsel for Defendants USAA Casualty*
*Insurance Company and USAA General*
*Indemnity Company*

101230140.1

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 8th day of June, 2015, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record that are registered with the Court's CM/ECF system.

*/s/ Johanna W. Clark*
Johanna W. Clark

101230140.1